## CASE *v.* TOFTUS.

*(Circuit Court, D. Oregon.  August 26, 1889.)*

**1. PUBLIC LANDS—SHORE LANDS.**
    On the admission of a new state into the Union, the "shore" or tide lands therein, not disposed of by the United States prior thereto, become the property of the state.

**2. SAME—RIPARIAN RIGHTS—WHARVES.**
    The owner of land abutting on the "shore" or tide lands in this state, and not disposed of by the United States or the state, has a right of access from his land to the water, and may erect and maintain a private wharf there for his own convenience, so long as he does not materially interfere with the rights of the general public, and subject to the power of the legislature to regulate such use.

*(Syllabus by the Court.)*

In Equity.  On motion for injunction.
*James F. Watson*, for plaintiff.
*Lewis L. McArthur*, for defendant.

DEADY, J.  This suit is brought to have the defendant enjoined from constructing a tramway along the northern shore of Yaquina bay, near its mouth, in front of certain property belonging to the plaintiff, whereby access to the bay from said property is hindered and prevented.

It is alleged in the bill that the plaintiff is the owner of a tract of land in Benton county, Or., known as the "Ocean House Property," and worth $15,000, with a tavern on it, which cost $6,000; that said property abuts on the northern shore of said bay, into which the plaintiff has constructed a private wharf, to and from which goods and passengers are transported across said shore, between said bay and tavern; that Yaquina bay is navigable for all ordinary vessels, and is within the ebb and flow of the ordinary tides of the Pacific ocean, whereby said shore is daily covered and uncovered for an average distance of 100 feet; that the defendant is wrongfully and unlawfully engaged in constructing a wooden tramway over and along said shore in front of said property, with intent to maintain the same there for at least three years, which will completely cut off and prevent access from said bay or wharf to said tavern, and *vice versa*, to the great damage of the plaintiff.

The suit was brought in the circuit court of the state for the county

of Benton, and removed here on the ground that the defense to the same arises under the laws of the United States.

Here a general demurrer was filed to the bill.. On the argument, the following points were made in support of the demurrer:

(1) The "shore" in question is tide-land, and therefore presumably belongs to the state of Oregon.

(2) The statutes of the state (Comp. 1887, § 3599 *et seq.*) provide for the acquisition of tide-lands by the owner of the abutting tract, but the plaintiff does not show any right thereunder.

(3) The right to build or maintain the wharf by the plaintiff depends on the statute of the state, the common law, or common usage; and neither the statute nor the common law confers any such right.

(4) There is no usage in Oregon by which the plaintiff can construct or maintain this wharf.

(5) A comparison of the maps in the surveyor general's office will show that the tide-land in question is within the corporate limits of the town of Newport, as defined by the act of February 21, 1887, which gives the town the exclusive power to regulate the erection of private wharves thereon; which power is also given to the town by virtue of sections 4227, 4228, of the Compilation of 1887.

By the statute of the state (Comp. 1887, § 3599) the commissioners for the sale of school lands are "authorized and required to sell * * * tide and overflowed lands on the sea-coast, owned by the state," as therein provided. This statute was passed on October 18, 1878. It gave the owner of land "abutting or fronting" on "the shore" of the Pacific ocean, or of any bay, the preference as a purchaser of such shore or tide land for one year from the passage of the act.

This act was passed on the assumption that upon the admission of the state into the Union—February 14, 1859—the title to the lands covered by the tide, then undisposed of by the United States, passed by operation of law to the state. How or why this is so, except to bolster up some fanciful notion of state sovereignty, I never could perceive. But on the authority of *Pollard* v. *Hagan*, 3 How. 212, and *Weber* v. *Commissioners*, 18 Wall. 57, this court must recognize it as the law of the land.

In his dissenting opinion in *Pollard* v. *Hagan*, *supra*, 231, Mr. Justice CATRON says a doctrine has lately sprung up in the courts of Alabama (*tempus*, 1844) " which assumes that all lands temporarily flowed with tide-water were part of the eminent domain, and a sovereign right in the old states; and that the new ones, when admitted into the Union, coming in with equal sovereign rights, took the lands thus flowed by implication as an incident of state sovereignty, and thereby defeated the title of the United States. * * * Although the assumption was new in the courts, it was not entirely so in the political discussions of the country. There it had been asserted that the new states coming in, with equal rights appertaining to the old ones, took the high-lands as well as the low, by the same implication now successfully asserted here, in regard to the low-lands; and, indeed, it is difficult to see where the dis-

tinction liês. That the United States acquired, in a corporate capacity, the right of soil under water, as well as of the high-lands, by the treaty with France, cannot be doubted; nor that the right of soil was retained, and subject to grant up to the time Alabama was admitted as a state."

In *Hinman* v. *Warren*, 6 Or. 408, the court went further, and held that the United States cannot dispose of the tide-lands, even in a territory. This decision is also based on the dogma of state sovereignty,— that is, the sovereignty of a state *in futuro*, which is yet, so to speak, *in utero*, or the womb of time, and may never be born.

The proposition is supported by the assertion "that the United States government has no constitutional or statutory authority to so act towards a territory, or so dispose of the lands within a territory, as to make it impossible to admit such territory upon an equal footing with the other states of the Union."

In Gould on Waters (section 40) it is said this is the only adjudication on the subject of the power of the national government, "while holding the title to the soil of the tide-waters," to make a valid conveyance of the same.

The author adds: "The decisions of the supreme court of the United States have been thought to lead to the conclusion reached in *Hinman* v. *Warren*, but it would seem that there is no very direct expression of such a view in the opinions of that court."

The doctrine that new states must be admitted into the Union on an "equal footing" with the old ones does not rest on any express provision of the constitution, which simply declares (article 4, § 3) "new states may be admitted by congress into this Union," but on what is considered and has been held by the supreme court to be the general character and purpose of the union of the states, as established by the constitution,—a union of political equals. *Pollard* v. *Hagan*, 3 How. 233; *Permoli* v. *New Orleans*, Id. 609; *Strader* v. *Graham*, 10 How. 92.

But certainly this equality does not require that the new state shall be admitted to any right in the soil thereof considered as property. The ante-Revolution states acquired no property in the soil thereof by entering into the Union. The lands that had not passed into private hands they already owned and held, as the political successors of the British crown.

The true constitutional equality between the states only extends to the right of each, under the constitution, to have and enjoy the same measure of local or self government, and to be admitted to an equal participation in the maintenance, administration, and conduct of the common or national government.

The pride of the new state may be touched at the thought of being the owner of the tide, swamp, and overflowed lands within its borders, and the tax-payer may flatter himself that the proceeds of their sale will lighten the burdens of taxation, but observation and experience in the new state tell a different tale. If aid is to be given to the new state out of the public lands within its borders, let congress provide that it shall have a liberal percentage of all the sales of such land.

The soil of Oregon was acquired by the national government by means

of the discoveries, explorations, and occupation of the citizens of the United States; and it was so acquired for the benefit of all, and not a part. In *Johnson* v. *McIntosh*, 8 Wheat. 595, Mr. Chief Justice MARSHALL, in considering the effect of a discovery of an uninhabited country by persons who acknowledge some existing government, says:

"The discovery is made for the benefit of the whole nation; and the vacant soil is to be disposed of by that organ of the government which has the constitutional power to dispose of the national dominions."

And in *Martin* v. *Waddell*, 16 Pet. 409, Mr. Chief Justice TANEY cites this language, and relies on this authority, in a case involving the right to the soil under the navigable waters of New Jersey. Congress is the organ of the national government that has the power to dispose of the territory and other property of the United States. Const. art. 4, § 3.

In the territories the national government is both the sovereign and proprietor. Congress has the power to govern them, and in so doing exercises the combined power of the national and state governments. *Insurance Co.* v. *Canter*, 1 Pet. 542. And as such sovereign and proprietor it may dispose absolutely of all the public land in the territory, whether high or low, wet or dry. For the time being, as sovereign, it has the *jus publicum*, or right of jurisdiction and control, of the shores for the benefit of the public, as in the case of a public highway over private land; while as proprietor it has the *jus privatum*, or right of private property, subject to the *jus publicum*. Gould, Waters, § 17.

This *jus publicum*, whether held by the national government during the territorial period or the state thereafter, may be sold or disposed of by the legislature of either, who represent the public. *Lansing* v. *Smith*, 4 Wend. 20; *Gould* v. *Railway Co.*, 6 N. Y. 538; Gould, Waters, § 32.

On the admission of the territory into the Union, the state, as the local sovereign or authority, succeeds to the *jus publicum*, except so far as may be necessary to enable the national government to make and maintain regulations of commerce. But it rests with congress to say when a territory shall be admitted into the Union as a state. Can any one say when, if ever, Alaska will be admitted into the Union, on an equal footing with Ohio, Pennsylvania, and New York? For aught that appears, it will ever be but very sparsedly populated. Its commercial value is principally as a splendid preserve for fish and fur; while, as a summer touring ground, and a place to get "far from the madding crowd," it is original and unequaled. Can it be possible that in the mean time the United States may not dispose of the private property in any of the "shore" of Alaska, which it purchased from Russia, but must hold it, willing or not, as trustee for some possible state or local sovereign that may arise or rule there in the far future? As well ask, it seems to me, if any grant or disposition of the shore in England by the crown, prior to *magna charta*, is binding on the succeeding sovereigns of the house of Hanover.

Assuming, as we must, in the present state of the decisions on the subject, that the "shore" or lands in Oregon periodically covered by the tides, and not disposed of by the United States while it was a territory,

are the property of the state, what, on the showing here made, is the condition of the "shore" in question, or the rights of the parties to this suit in relation thereto? There is nothing to show that it ever has been disposed of by either the state or the United States. By the act of 1887, *supra*, the state has authorized its sale. So far as appears, this sale may be made without qualification or reservation,—a sale of both the *jus publicum* and the *jus privatum*,—in which case the vendee would acquire the private property in the land, and the right of the public to the use of the same for the purpose of navigation or fishing.

Whether any reservation of the *jus publicum* has been made in the deeds executed by the commissioners to vendees under the act I am not advised.

The plaintiff is the owner of land abutting on the "shore" of Yaquina bay. How he acquired it does not appear, and it may not be material. But the title must be derived from the United States, under some of the acts of congress providing for the disposition of the public lands in Oregon. Be this as it may, as a littoral proprietor he has a right of access from his premises to the water, and to erect and maintain a private wharf there, at which to land and embark, so long as he does not materially interfere with the rights of the public, and subject to the power of the legislature to regulate such use or privilege. *Dutton* v. *Strong*, 1 Black, 25; *Railway Co.* v. *Schurmeir*, 7 Wall. 272; *Yates* v. *Milwaukee*, 10 Wall. 497; *Weber* v. *Commissioners*, 18 Wall. 57; Gould, Waters, §§ 124, 149, 151, 154.

The defendant has no special right in the "shore," or to the use of it, beyond that of the general public, which does not include the right to construct or maintain a tramway or other structure upon or over it, that would prevent or substantially impair the littoral proprietor's right or privilege of access to and from the water.

It does not appear from the bill that this tramway is in fact such a structure, or whether the rail or track is laid level with the sand or earth or not. Presumably it is so. But it was admitted on the argument that it is 12 or 15 inches above the surface of the ground, and therefore cannot be crossed by a wheeled vehicle, unless it is bridged.

*Prima facie*, then, the tramway is a nuisance, which works a special injury to the plaintiff, and the defendant ought not to be allowed to maintain it; and an injunction is the proper remedy for the wrong. 1 Pom. Eq. Jur. § 252; Gould, Waters, § 21.

The point made under the act of 1887 cannot now be considered. The facts on which it rests are not in the record, nor are they such as the court can take judicial notice of. It does not appear from the bill that the "shore" in question is within the corporate limits of Newport, or that the land of the plaintiff is.

In this opinion some possible aspects of this case are considered that are not absolutely necessary to the decision on this demurrer. But they were seriously propounded by the learned counsel for the parties, and the consideration of them invoked.

The demurrer is overruled.