Argued June 5, 1967, reversed June 14, petition for rehearing denied August 20, 1968

## SMITH TUG & BARGE CO. ET AL, *Respondents, v.* COLUMBIA-PACIFIC TOWING CORPORATION, *Appellant.*

443 P. 2d 205

*Fredric R. Merrill* and *Dennis J. Lindsay,* Portland, argued the cause for appellant. With them on the briefs were Krause, Lindsay & Nahstoll, Portland.

*Paul J. Jolma,* Clatskanie, and *John F. McCarthy,* Longview, Washington, argued the cause and filed a brief for respondents.

Before PERRY, Chief Justice, and McALLISTER, SLOAN, O'CONNELL, DENECKE, HOLMAN and LUSK, Justices.

DENECKE, J.

The perplexing issue in this case is who has the right to moor logs and build facilities therefor in the Columbia River below the low-water mark.

The defendant, Columbia-Pacific Towing Corporation, purchased what is known as Sharkey or Sandy Island, which lies in the Columbia off Goble, on the Oregon side of the river. Its title goes to the island's high-water mark. The water around the island is a desirable log storage area.

The State of Oregon owns the area between the high- and low-water marks of the island. The State also has title to the bed of the river below the low-water mark.

The State advertised for bids for the lease of the land surrounding the island and lying between the low- and high-water marks. The defendant submitted the minimum bid and the plaintiffs submitted a bid of $15,000 per year. Pursuant to ORS 274.040, the defendant was given the opportunity to meet this highest bid of $15,000 and exercise its preference. It declined and the State leased such land to plaintiffs.

Plaintiffs brought this declaratory judgment proceeding and asked the trial court to declare that plaintiffs had the exclusive right to the use of all the land abutting upon or adjacent to the island below the low-water mark as well as land below the high-water mark. The State was named as a party but took no active part in the proceeding and is not a party to this appeal.

The trial court found in favor of plaintiffs, and the defendant appeals.

The river at this point is subject to the ocean tides. The logs would be moored below the low-water mark and the pilings and dolphins that must be driven into the land under water would be in the same area, with a few, perhaps, between the high- and low-water marks.

The land lying above the high-water mark is customarily called the upland. The land lying between

the high-water mark and the low-water mark in tidal waters is described as tidelands. The Oregon statute, to describe the land between the high-water mark and the low-water mark in both tidal and nontidal waters, uses the phrase "submersible lands," and we shall likewise use such phrase to describe such lands. ORS 274.005(4). Oregon statutes use the phrase "submerged lands" to describe the land lying below the low-water mark whether in tidal or nontidal waters. ORS 274.705 (8) and 274.005(5).

The parties claims are unique in property law in that they are both claiming the right to use the water below the low-water mark and the submerged land beneath this water, to which they claim no title or easement by grant. Their claim is grounded solely upon the proposition that their lease of the tidelands, —in the case of the plaintiffs,—and its ownership of the upland,—in the case of the defendant Columbia-Pacific Towing Corporation—carries with it the right to use the water and the submerged land below the water which is adjacent to the island.

This contention, although it is peculiar to rights in waters, is well accepted. The problem in this case is to determine what are the rights in the adjacent waters and submerged lands below concomittant to ownership of the upland and the tideland and, in the event of a conflict, which rights are paramount.

A classic statement was made by Lord Selborne in *Lyon v. Fishmongers' Company*, 1 L R App Cas 662, 682 (1876):

"* * * But the rights of a riparian proprietor, so far as they relate to any natural stream, exist *jure naturae*, because his land has, by nature, the advantage of being washed by the stream; * * *

"With respect to the ownership of the bed of the

river, this cannot be the natural foundation of riparian rights properly so called, because the word 'riparian' is relative to the bank, and not the bed, of the stream; and the connection, when it exists, of property on the bank with property in the bed of the stream depends, not upon nature, but on grant or presumption of law * * *."

Farnham, in his work on Waters and Water Rights, states:

"In all states where the common law has not been changed, the owners of land abutting on bodies of water are accorded certain rights by reason of their adjacency which are different from those belonging to the public generally, and are comprehended within the general term 'riparian rights.' * * *" 1 Farnham, Waters and Water Rights, 278 (1904).

What these riparian rights are is not a subject of agreement among all jurisdictions. In *Yates v. Milwaukee*, 77 US 497, 504, 10 Wall 497, 19 L ed 984 (1871), the statement is made:

"* * * [A]nd among those rights are access to the navigable part of the river from the front of his lot, the right to make a landing, wharf or pier for his own use or for the use of the public * * *"

The general right of access and to wharf out includes the right to wharf out "to the navigable part of the river in front of his property and the right to make a landing, dock or pier upon his harbor line * * *." *United States v. River Rouge Co.*, 269 US 411, 417, 46 S Ct 144, 70 L ed 339 (1926).

The right to wharf out has been held to include the right to build and maintain log booms out in the river in front of the boom operator's upland property.

Farnham, supra, at 334, n 9, states: "He [the owner of the riparian rights] may maintain booms along the bank to facilitate the handling of logs."

In *Coquille Mill & Mercantile Co. v. Johnson,* 52 Or 547, 551, 98 P 132, 132 Am St Rep 716 (1908), the court phrased the question: "What right, if any, has a riparian owner to construct in navigable water adjacent to his property, a boom to store logs, and is such right assignable?" The court held he did have such right and it was assignable; however, the party had both the upland and the tideland and the court emphasized this riparian right was inherent in the tideland, not the upland.

However, the court specifically held:

"* * * [R]iparian owners upon navigable fresh rivers and lakes may construct, in the shoal water in front of their land, wharves, piers, landings, and *booms,* in aid of and not obstructing navigation. This is a riparian right, being dependent upon title to the bank, and not upon title to the bed of the river. * * *" (Emphasis added.) 52 Or at 551.

In the *Coquille* case the operation was exactly as contemplated in the present case. The owner of the bank leased the booming rights. The lease granted " 'the right and privilege of putting in and maintaining a boom for holding logs and timber along the line of the premises of the said Gilman.' " 52 Or at 550. The lessees drove piling into the river bed 120 to 130 feet from the bank. Logs were brought in by water, stored and later taken out by water.

Wisconsin has clearly and consistently held the right to construct a log boom is a riparian right. In

618

*Stevens Point Boom Co. v. Reilly,* 44 Wis 295, 304-305 (1878), the court stated:

> " 'Distinguished from appropriation and occupation of the soil under the water, a riparian owner upon navigable water, whether or not he owns the soil *usque ad medium filum aquae,* and unless prohibited by local law, has a right to construct, in shoal water, in front of his land, proper wharves or piers in aid of navigation, and, at his peril of obstructing navigation, through the water far enough to reach actually navigable water; this being held to further the public use of the water, to which the public title under the water is subordinate; and therefore to be, in the absence of prohibition, passively licensed by the public, and not a pourpresture.' *Diedrich v. Railway Co.,* 42 Wis., 248.
>
> "This was said of waters generally navigable by all methods. This court has, however, uniformly held streams of sufficient capacity to float logs to market to be so far navigable. *Whisler v. Wilkinson,* 22 Wis., 572; *Sellers v. Lumbering Co.,* 39 id., 525; *Olson v. Merrill,* 42 id., 203. In such streams, proper booms and like works to aid in floating logs to market serve the like purpose, and stand for and in the same right, and subject to like limitations, as the piers and wharves on waters generally navigable, spoken of in *Diedrich v. Railway Co.*
>
> "Such being the riparian right of the appellants, they may lawfully, until prohibited by statute, construct, in front of their land, proper booms to aid in floating logs, so as not to violate any public law or obstruct the navigation of the river by any method in which it may be used, or infringe upon the rights of other riparian owners. \* \* \*"

In *Williamsburg Boom Co. v. Smith,* 84 Ky 372, 1 SW 765 (1886), the defendant was a boom company which maintained movable booms to store logs to be later rafted to a nearby mill. The boom company

claimed the right to boom by an arrangement with the upland owner, who also operated the mill. The court held the boom company had a riparian right to boom logs in the river.

There are a myriad of Oregon decisions in this area, as well as some legislation. The Oregon decisions, however, are not completely clear and for that reason we have first set forth the general state of the law outside this jurisdiction.

The increasing problems concerning our rivers and ocean and their banks deserve a current review of the Oregon decisions and an attempt to clarify the law in Oregon.

*Parker v. Taylor,* 7 Or 435 (1879) : Plaintiff owned upland and tidelands in Astoria and alleged that the defendant was threatening to build an obstruction beyond the low-water mark which would interfere with plaintiff's right to wharf out to navigable water. The defendant claimed ownership by grant of the land below the low-water mark upon which he had driven piling. The court did not determine whether the defendant had title; instead, it held the plaintiff had a riparian right to build a wharf over the land claimed by defendant:

> "* * * This right of wharfage is a franchise appurtenant to the riparian owner, and if any person builds a structure which interferes with it, by intervening between the shore and the keep water where ships can come and ride in safety, the owner of the shore may have such structures removed, so that his wharf can be extended to a place convenient for the uses of commerce. * * *" 7 Or at 446.

*Parker v. Rogers,* 8 Or 183 (1879) : The defendant Rogers received a grant from Cyrus Olney to upland

in Astoria, which grant reserved the wharfing privileges. Olney subsequently granted the tidelands in front of the property to the plaintiff Parker. Parker erected a wharf. There was already in existence the statute authorizing the owner of any land "lying upon any navigable stream" to construct a wharf into the stream beyond the low-water mark, now ORS 780.040, referred to as the wharfing statute.

The court held:

> "We are aware that it is a general rule that what is appurtenant to land, passes with it, being an incorporeal hereditament, but the right to build a wharf on the land of the State below high water, is a franchise which attaches to the tide land, and it is appurtenant to it rather than to the adjacent land, for it can be severed from the adjacent land and enjoyed without it. The legislature has established the right of the adjacent owners to sell the right of wharfing on the adjoining tide lands, by recognizing such sales and giving the owners thereof the preference to purchase." 8 Or at 190.

*Wilson v. Welch,* 12 Or 353, 7 P 341 (1885): The court stated in what probably is dictum:

> "Too much importance, I apprehend, has been attached to the tide-land act before referred to. I seriously doubt whether that act confers any new right upon the shore-owner in such cases, although he has purchased the land in front of him in accordance with its terms. The title he obtains is subordinate to the public right of passage and navigation, and he had the same wharfage privileges before as afterwards, and the right to protect his uplands from the encroachments of the sea. According to Hale there are three sorts of rights in ports and shores: *First,* the *jus privatum,* or right of property or franchise; *second,* the *jus publicum,* or public right of passage and navigation; and

*third,* the *jus regium,* or governmental right. The State could not, by any sale of the shore of a body of water below high tide, deprive itself of the latter right; nor, as before suggested, could it thereby deprive the public of the right of passage or navigation. What, then, can such a sale of that character of tide land amount to? I doubt very much whether a sale in such a case could be made to an outside party that would deprive the riparian owner of any right to the enjoyment of the land." 12 Or at 359. *Accord, McCann v. Oregon Railway etc. Co.,* 13 Or 455, 462-463, 11 P 236 (1886).

In *Parker v. West Coast Packing Co.,* 17 Or 510, 515, 21 P 822, 5 LRA 61 (1889), the court stated:

"* * * The land below high-water mark upon a navigable river, and which constitutes a part of its bed, belongs to the state in its sovereign capacity, subject to the riparian rights of the owner of the land above and adjacent thereto. * * *"

The opinions in the last three cases were written by Mr. Justice THAYER.

Judge Deady decided the case of *Case v. Toftus,* 39 F 730 (CC D Or 1889), involving Oregon property on Yaquina Bay, a bay on the Pacific Ocean. The plaintiff owned the upland and the state the tidelands. The plaintiff brought suit to enjoin the defendant from constructing a tramway on the tidelands in front of his property and thereby blocking his access to the bay. The defendant did not claim any special grant of a right to use the tidelands.

The court overruled the demurrer to plaintiff's complaint. Judge Deady stated:

"* * * Be this as it may, as a littoral proprietor he has a right of access from his premises to the water, and to erect and maintain a private

wharf there, at which to land and embark, so long as he does not materially interfere with the rights of the public, and subject to the power of the legislature to regulate such use or privilege. * * *" 39 F at 734.

The plaintiffs, the tideland lessees, primarily rely upon *Bowlby v. Shively,* 22 Or 410, 30 P 154, affm'd 152 US 1, 14 S Ct 548, 38 L ed 331 (1893). Shively platted certain Astoria property lying below the high-water mark and sold such property to Bowlby's predecessor in title. The conveyance made no mention of wharfage rights. Shively contended that such silence indicated a reservation to him of his right to wharf from the upland over the tidelands conveyed to Bowlby's predecessor out to navigable water. The State conveyed the tidelands to Bowlby. Bowlby built a wharf out into the Columbia River and Shively urged that such wharf was in violation of his riparian right of wharfage. The court held for Bowlby, the tidelands owner, and against Shively, the upland owner.

Mr. Justice LORD, writing for a unanimous court, declared that " 'the opinion of our predecessors in the adjudged cases' " was "that the state may sell and convey its tide lands, and that its grantees take them free from any right therein by the upland owner, and subject only to the paramount right of navigation inherent in the public * * *." 22 Or at 422-423. The court believed that in the previous cases, in which the opinions were written by Mr. Justice THAYER, the statements therein contrary to the decision in *Bowlby v. Shively,* supra, were the personal views of Mr. Justice THAYER alone and were not joined in by his brethren. On the other hand, Mr. Justice LORD observed that if the question were an open one, his personal views were contrary to the decision he reached.

This case was affirmed by the Supreme Court of the United States, which held:

"* * * The title and rights of riparian or littoral proprietors in the soil below high water mark, therefore, are governed by the laws of the several States, subject to the rights granted to the United States by the Constitution." 152 US at 57-58.

Mr. Justice LORD wrote the decision for the court in *Lewis v. City of Portland,* 25 Or 133, 35 P 256, 42 Am St Rep 772, 22 LRA 736 (1893). In this case the plaintiffs owned the upland and probably the submersible land; however, the court did not consider the latter important. The land was on the bank of the Willamette River at the foot of Burnside Street, in Portland. The city proposed to build a bridge and use the land between the high- and low-water marks, which would destroy the use of a wharf built there by the plaintiffs. The Willamette is considered a nontidal stream at this point. The court held that the law applicable to tidelands was not applicable to nontidal, navigable streams and the upland owner on a nontidal, navigable stream had the riparian right to build a wharf resting on the bed of the stream below high- and low-water marks. If such right were taken, compensation would have to be paid.

*Montgomery v. Shaver,* 40 Or 244, 66 P 923 (1901), also involved riparian rights on the Willamette. It held, as did *Lewis v. City of Portland,* supra (25 Or 133), that the upland owner had the riparian right to wharf out and in support of such proposition cited cases involving tidal waters as well as nontidal rivers, including *Bowlby v. Shively,* supra (22 Or 410). The wharfing statute, already referred to, was relied upon. The court said of such statute:

"* * * Section 4227 is said to be a permis-

sive statute, which alludes to certain things that may be done, but does not vest any right until exercised. It constitutes a license revocable at the pleasure of the legislature until acted upon: *Bowlby v. Shively*, 22 Or. 410 (30 Pac. 154); *Lewis v. City of Portland*, 25 Or. 133, 136 (35 Pac. 256, 22 L. R. A. 736, 42 Am. St. Rep. 772). The statute is, however, declarative of the right or privilege which existed at common law, the exercise of which might be regulated by statute; but so long as it was not prohibited it existed as a private right derived from the passive or implied license by the public: Gould, Waters, § 176. So that the enactment of Section 4227 gave positive authority where it previously existed passively and by implication. * * *" 40 Or at 248.

In *Hume v. Rogue River Packing Co.*, 51 Or 237, 83 P 391, 92 P 1065, 96 P 865, 131 Am St Rep 732, 31 LRA (NS) 396 (1908), land along the Rogue River, both above and below tidewater was involved. Without distinguishing between tidal waters and nontidal waters, the court stated:

"By the law of this state, as declared and established by this court, the owner of upland bordering on navigable water has no title in the adjoining lands below high-water mark, nor any rights in or over the adjoining waters as appurtenant thereto: * * *." 51 Or at 246.

Mr. Commissioner Slater, who wrote the opinion in *Hume v. Rogue River Packing Co.*, supra (51 Or 237), also wrote the subsequent opinion in *Coquille Mill & Mercantile Co. v. Johnson*, 52 Or 547, 98 P 132, 132 Am St Rep 716 (1908). This was an action for ejectment to secure possession of property enclosed by a log boom erected by defendant in the Coquille River. Apparently, the locale was above tidewater. The defendant owned both the upland and the submersible lands. The boom was built by driving piling above and

below the low-water mark. Plaintiff relied upon the statement from *Hume v. Rogue River Packing Co.*, supra (51 Or 237), above quoted. But Mr. Commissioner Slater stated:

"* * * But that statement was confined to the rights of an upland owner, as distinguished from a tideland owner or one who owns to low-water mark, which was Gilman's situation. But 'riparian owners upon navigable fresh rivers and lakes may construct, in the shoal water in front of their land, wharves, piers, landings, and booms, in aid of and not obstructing navigation. This is a riparian right, being dependent upon title to the bank, and not upon title to the bed of the river. * * *'" 52 Or at 551.

Such right was termed "a mere franchise." 52 Or at 552. Defendant was held to have the right to maintain the boom.

*Corvallis & Eastern R. Co. v. Benson,* 61 Or 359, 121 P 418, appeal dismissed 235 US 691, 35 S Ct 206, 59 L ed 428 (1912): We held the legislature could not recall a grant of tidelands to an embryonic railroad. We stated:

"It is well settled that the tidelands laid bare, and anon flooded by the sea as it ebbs and flows, became the property of the State on its admission into the Union. In the title thus conferred upon the State, there are two elements—the *jus privatum,* or private right, and the *jus publicum,* or public authority. The former is a species of private property which a state holds in the same way that an individual citizen owns land which he has acquired from the United States by any of the methods provided for the sale of the public domain, or from any private person by purchase and conveyance. This private property in tidelands, the State by its legislative assembly, may grant to any one in any manner, or for any purpose, not forbidden by

the constitution, and the grantee will thereby take the title described in the grant as absolutely as if the transaction were between individuals; one conveying his private lands to the other. The State, however, cannot abdicate or grant away the other element of its title to tidelands—the *jus publicum,* or public authority over them. This is the dominion of government or sovereignty in the State, by which it prevents any use of lands bordering on the navigable waters within the State which will materially interfere with navigation and commerce thereon. * * *" 61 Or at 369-370.

*Rasmussen v. Walker Warehouse Co.,* 68 Or 316, 136 P 661 (1913): Plaintiff owned a lot on the tidal portion of the Coquille River. The character of the lot was not precisely stated, but it certainly was at least partially tideland and a portion may have been above the high-water mark, i.e., upland. The lot was part of a platted addition and defendant owned the lot in back of plaintiff's lot, or away from the river. The issue was whether defendant had riparian rights and, therefore, could build a wharf in front of plaintiff's lot on land which was partially tidelands and partially below the low-water mark. The court held:

"By the platting and dedication of Woodland addition to Bandon by the former owners, thereby laying out the property in blocks and lots constituting definite metes and bounds as shown on the map, and by conveyances of lots with reference to the map, the riparian or wharf rights were severed and disassociated from all the inside lots and attached to the outermost ones, of which plaintiff's lot 2, block 3, is a part: * * *." 68 Or at 328.

The court made the following observation:

"As a general proposition, it may be stated that the upland and the land under the water forming, as they do, different parts of one entire estate,

.there is nothing to prevent the separation of the estate at the water line so as to permit the bed of the water to be owned by one person and the upland by another.

. "Such a separation results in conferring the ownership of the water, so far as it can rest in an individual, upon the one who owns the bed of the stream, and such ownership carries certain of the rights which are known as riparian rights. It gives the right to make use of the bed of a stream and of the power furnished by the bed of the water. This rule applies to land bordering on tide water and that bordering on fresh streams and rivers.

"In order to accomplish a separation, the intention to effect it must be made distinctly to appear. If the grant is in the ordinary form bounded only by the water, the land below, as well as that above the water, will pass.

"But the land under the water may be reserved by the reservation of a strip along the shore, so as to prevent the grant from carrying title to the water's edge and making the grantee a riparian owner: 3 Farnham, Waters and Water Rights, § 724. * * *." 68 Or at 325-326.

As we stated, it is not clear from the opinion whether the court regarded plaintiff's lot as above the high-water mark or as tidelands. It is clear from the portion of Farnham's work which is cited by the court that Farnham is referring to reserving a strip of land adjacent to and above the high-water mark.

*Eagle Cliff Fishing Co. v. McGowan,* 70 Or 1, 137 P 766, appeal dismissed 248 US 589, 39 S Ct 5, 63 L ed 435 (1914): Plaintiff was the lessee of tidelands upon the lower Columbia, in tidal waters. The defendant was fishing with set nets apparently located just below the low-water mark and fronting on plaintiff's leased tidelands. Defendant's conduct prohibited plain-

tiff's access from the river to the tidelands. The court affirmed an injunction against defendant. The court held:

> "As an incident to the lawful occupation of lands, one border of which is the low-water line of the Columbia River, the plaintiff had the private right of access at such sites to and from that stream: * * *
>
> "* * * * *
>
> "* * * Subject to the paramount right of navigation, the state, pursuant to legislative enactments, has been authorized to sell and convey any part of its lands lying between ordinary high water and low water, and the grantee of such tidelands is the riparian proprietor to the exclusion of the upland owner: *Bowlby v. Shively,* 22 Or. 410 (30 Pac. 154)." 70 Or at 11-12.

*Fellman v. Tidewater Mill Co.,* 78 Or 1, 152 P 268 (1915), was a suit by the owner of the submersible lands against a mill operator who had driven piling to construct a log boom in front of plaintiff's tidelands. The boom was on the Siuslaw River, but the opinion does not state whether above or below tidewater. The mill operator did not have title to the adjacent land. The court held the submersible land owner had the right of access to deep water and found for the plaintiff.

*Harrison v. Pacific Ry. & Nav. Co.,* 72 Or 553, 144 P 91 (1914): The plantiff owned the upland and the defendant the tidelands. The defendant built its railroad over a portion of plaintiff's land, cutting off plaintiff's access to the navigable water and preventing him from floating his timber from his land to navigable water. The defendant claimed plaintiff had no right of access because defendant owned the tidelands. The court approved permitting the jury to con-

sider as an element of damage the interference with plaintiff's access to the navigable water. Mr. Justice BURNETT stated:

"The tidal waters in any arm of the sea constitute nature's highway, and the situation presented is analogous to one where a public county road should be laid out and established over the defendant's upland. Under such circumstances, if it did any act to prevent the plaintiff's lawful access to such a highway, it would be an element of damage. Here, in a certain sense, was a highway over the defendant's land, at least during such time as the water would permit the flotation of logs. If the plaintiff could obtain access to that water for such purposes, the deprivation of that right would constitute an element of damage if caused by the construction of the defendant's road. Besides all this, if it were possible for access to be obtained to the tide-lands for logging purposes by purchase or otherwise, any act of the defendant which would render such access impossible would of course tend to depreciate the value of the land upon which the timber grew, and which would be the subject of logging operations. In other words, the mere proximity of land to tide water is an enhancement of value not possessed by land at some inaccessible point in the distant interior. If, therefore, this adjacency to navigation is seriously impaired or practically destroyed so as to make plaintiff's lands substantially as inaccessible as the interior land, that fact ought to be submitted to the jury with others illustrating the situation, and considered in estimating the damage resulting from the acts of the defendant." 72 Or at 558-559.

The *Bowlby* case is quoted for another proposition and no mention is made that the *Bowlby* decision apparently decided the issue of access to the contrary.

*Darling v. Christensen,* 166 Or 17, 109 P2d 585 (1941): By grant from the state plaintiff owned sub-

mersible lands on Siltcoos Lake, a nontidal, navigable body of water. Defendant owned the adjoining upland. We held that the upland owner had a right of access to the lake over the submersible lands. No distinction between tidal or nontidal waters was suggested. No mention was made of *Bowlby v. Shively,* supra (22 Or 410). Professor Farnham was quoted with approval as follows:

"* * * 'It thus appearing from the preceding sections that at common law the riparian owner has a right of access to the stream which cannot be destroyed even for the improvement of navigation without making compensation to the owner, the right should be much more fully protected in this country, where the constitutions prevent the taking of private property for public use without making compensation. * * * The riparian owner holds this right by as sacred a tenure as he holds the land from which it emanates. * * * This principle prohibits any interference with the individual's right of access. Wharves or piers cannot be erected in such a way as to interfere with it, nor buildings, nor permanent floating structures, nor a tramway. Nor can vessels be moored in such a way as [to cut off the access of the riparian owner] *unreasonably to interfere with the access. Nor can logs be boomed in such a way as to cut off the access of the riparian owner.* * * *' Vol. I, Farnham, Water and Water Rights, 1904 Ed., § 66, pp. 297 et seq." 166 Or at 32-33. *Note:* The bracketed phrase above appears in the reported case, but does not appear in Farnham's text. The italicized statements above appear in Farnham's text, but do not appear in the reported case.

Professor Farnham does not distinguish between tidal and nontidal waters.

*Hoff v. Peninsula Drainage Dist.,* 172 Or 630, 143 P2d 471 (1943), is not directly in point; however, by

indirection it may be. Plaintiff owned land in a slough of the Columbia River. It is not known whether it was affected by the tide; apparently, the court did not believe this was important. The plaintiff's land probably extended to the high-water mark. The court stated:

> "Riparian rights of owners of lands adjacent to navigable waters are, in general, the following: (1) the right of access to the water, (2) the right to build a pier out to the line of navigability, (3) the right to accretions, and (4) the right to a reasonable use of the water as it flows past the land: 45 C. J., Navigable Waters, § 143, at page 491." 172 Or at 638-639.

*McCarthy v. Coos Timber Co.*, 208 Or 371, 302 P2d 238 (1956): Plaintiff owned the upland on a tidal estuary. Plaintiff had leased the shore to persons who stored logs in booms in the water adjacent to plaintiff's property. The timber company secured a lease from the State of the tidelands fronting and abutting upon plaintiff's upland. McCarthy brought the suit contending the lease violated his statutory right to have first preference on leasing tidelands in front of his upland. The court decided the lease was invalid because insufficient notice of bids to lease was given the plaintiff upland owner. As dicta the court made the following statements pertinent to the present problem:

> "The defendants insist that the owner of uplands has no riparian property interest in the abutting tide lands but only a statutory preference. This proposition requires some qualification. We must agree that our decisions indicate that the state may so dispose of tide lands as to deprive the uplands owner of any right thereto. Nevertheless there are well-recognized rights in the upland owners which are not derived from the statutory preference right

and which have been recognized by the courts for many years. We refer to the common-law right of access to deep water. We are not here concerned with any question of the power of the state by proper procedure to limit or destroy the right of access without giving compensation when it deeds or leases tide lands to others than the upland owner. We cite the following authorities to show that both courts and legislature have repeatedly recognized a public policy to protect the interests of upland owners in abutting tide lands. The general rule is stated thus:

" 'The rule prevailing in most jurisdictions is that the ownership of land bordering on a navigable stream or body of water, either tidal or nontidal, carries with it, as incidental thereto, the right of access from such land to the navigable channel or portion of such stream or body. This right of the riparian or littoral proprietor is distinguished from that which individual members of the general public enjoy. It is a property right analogous to an abutting owner's right of access to a highway on land, and is something more than the common or public right of access to the water front from public grounds or over a public approach.' 56 Am Jur 677, Waters, § 216." 208 Or at 387-388.

We further stated:

"It is unnecessary for us to decide whether an upland owner has an easement of access to the water over meander land or tide land which has been deeded by the state to a third party. [Citing, among other decisions, Bowlby v. Shively, supra (22 Or 410)]." 208 Or at 395-396.

*State Land Board v. Sause,* 217 Or 52, 342 P2d 803 (1959): The State sought to have a strip of land along the tidal portion of Tillamook River 300 feet long and 12 feet wide at its widest part declared tidelands. The defendant had a log dump on a portion of such land. Defendants owned the adjacent upland.

We held that the land was not tideland. We went on to state:

> "The land at the locus in quo, according to the record, has no use and no value except as a means for exacting payment from the upland owner for the benefit of the state. In such a case, in balancing the defeasible right to access by the upland owner to navigable waters and his reasonable use thereof, against the interest of the public to use of the tideland, it is clear that the use of the lands at the locus in quo by the defendants is reasonable and not injurious to the public use. We believe that the above approach to the problem is a reasonable one. It would be anachronistic if the state of Oregon should adopt a rule of law in 1959 which would treat the state as the king of England was treated in his proprietary capacity before the war for independence. It is our belief that the state has failed to establish that the defendants are committing any wrong upon the locus in quo which entitles it to the relief which it seeks. The evidence fails to show that the state has any need whatever for the strip of purported tideland. The defendant's use of it, if the land is deemed tideland, does not interfere with navigation—to the contrary, it is an aid to navigation. The state, assuming that the strip is tideland, is its owner. If it ever requires the land's use for any public purpose it can obtain its possession." 217 Or at 77-78.

We also observed:

> "But the power to sell a fee simple interest in the tidelands is not inconsistent with a defeasible right of access and reasonable use thereof—a right which exists only until the state exercises its power to develop the lands or conveys them to someone else." 217 Or at 74-75.

These are not all the decisions on the general subject but are sufficient to illustrate the various posi-

tions taken by this court on the kinds of problems that arise in this area.

Several statutes also add to the Oregon law on the subject. ORS 780.040, already referred to in some of the cases, provides:

"The owner of any land lying upon any navigable stream or other like water, and within the corporate limits of any incorporated town or within the boundaries of any port, may construct a wharf or wharves upon the same, and extend the wharf or wharves into the stream or other like water beyond low-water mark so far as may be necessary and convenient for the use and accommodation of any ships, boats or vessels that may or can navigate the stream or other like water."

ORS 780.050 implements this statute and provides:

"The corporate authorities of the town wherein the wharf is proposed to be constructed, or the commission of any port wherein the wharf is proposed to be constructed if it is not within any town, may regulate the exercise of the privilege or franchise granted in ORS 780.040. Upon application of the person entitled to and desiring to construct the wharf, the corporate authorities or port commission, as the case may be, may by ordinance or other like mode prescribe the mode and extent to which it may be exercised beyond the line of low-water mark so that the wharf shall not be constructed any farther into the stream or other water beyond the low-water line than may be necessary and convenient for the purpose expressed in ORS 780.040 and so that it will not unnecessarily interfere with the navigation of the stream or other like water."

The statute granting the upland owner a preference in leasing or buying the tidelands from the state is ORS 274.040(1), which provides:

"Except as provided in subsection (2) of this

section, tide and overflow lands owned by the State of Oregon may be sold or leased only to the highest bidder after being advertised not less than once each week for four successive weeks in two or more newspapers of general circulation in the state, one of which must be of general circulation in the county in which the lands are situated. However:

"(a) No such lands shall be sold for less than $5 per acre.

"(b) Any owner of lands abutting or fronting on such tide and overflow lands shall have the preference right to lease or purchase at the highest price offered in good faith. This preference does not apply as to any lease offered or issued by the division under ORS 274.615 or 274.705 to 274.860.

"(c) No accretions to islands heretofore sold by the state shall be leased."

ORS 777.120(1) provides:

"To the full extent which the State of Oregon might itself exercise and control or to which it can grant to ports the right to exercise the same, ports shall have full control of all bays, rivers and harbors within their limits, and between their limits and the sea, with full power and authority to, from time to time, make, establish, change or abolish wharf lines in such harbors and rivers, and to make, establish, change, modify or abolish such rules and regulations for the use of navigation in such harbors, or the placing of obstructions therein or the removal of obstructions therefrom, as the port deems convenient, requisite or necessary or in the best interests of the maritime shipping and commercial interests of the port."

The island and the adjacent areas involved here are within the boundaries of the Port of St. Helens. The Port has granted the defendant upland owner a permit to moor logs adjacent to the island.

No structures may be built in any navigable stream

without obtaining the permission of the United States Corps of Engineers. The Corps acts as the protector of public navigation. 33 USCA § 403. In the instant case the Corps will not issue a permit until this controversy is solved.

From the review of our past decisions it is apparent that we have not been as precise as we might have been.

In *Bowlby v. Shively,* supra (22 Or at 423), we directly held "that the state may sell and convey its tide lands, and that its grantees take them free from any right therein by the upland owner * * *." We continued to follow that principle in tidal waters. For example, in *Eagle Cliff Fishing Co. v. McGowan,* 70 Or 1, 12, 137 P 766, appeal dismissed 248 US 589, 39 S Ct 5, 63 L ed 435 (1914), we stated: "* * * and the grantee of such tidelands is the riparian proprietor to the exclusion of the upland owner: *Bowlby v. Shively* [citation] * * *."

However, during this same period the court drew a distinction between tidal and nontidal waters and held that the doctrine of *Bowlby v. Shively,* supra (22 Or 410), did not apply in nontidal waters. *Lewis v. City of Portland,* 25 Or 133, 35 P 256, 42 Am St Rep 772, 22 LRA 736 (1893).

Then, in *Harrison v. Pacific Ry. & Nav. Co.,* supra (72 Or 553), we held that an upland owner is entitled to damages if a private tidelands owner cuts off the upland owner's access to navigable tidal waters. It is possible that the court was not concerned with access to navigation over tidelands, but, rather, to the upland owner's right, along with the general public, to navigate over the tidelands when such lands are covered with water.

Later, in *Darling v. Christensen,* supra (166 Or 17), we held that an upland owner had the right of access over submersible land held by a grantee of the State. The locale was upon nontidal waters, but the court made no reference to this and relied primarily upon Farnham, supra.

The two most recent cases, *McCarthy v. Coos Timber Co.,* supra (208 Or 371), and *State Land Board v. Sause,* supra (217 Or 52), seem to hold that when the State is not using the tidelands and has not leased or conveyed them, the upland owner has certain riparian rights over the tidelands.

The wharfage statute is of no assistance because it has been interpreted to grant the authority to wharf out to the tidelands owner, *Parker v. Rogers,* supra (8 Or 182), and to the upland owner, *Montgomery v. Shaver,* supra (40 Or 244).

■ We have finally come to the conclusion that when the State has leased or conveyed the tidelands bordering on tidal waters the riparian rights are lodged in the tidelands owner or lessee. This includes the right to build structures on the bed below low-water mark and the right to moor logs on the water.

We believe such a decision is in accord with the tenor of most of our past decisions, particularly the cornerstone case of *Bowlby v. Shively,* supra (22 Or 423). Such disposition also appears to be the more realistic solution. If the ownership or possession of the tidelands were private at the time the upland was purchased, the purchaser should have been put on notice because of *Bowlby v. Shively,* supra (22 Or 410), and its successors, that at the very least it was questionable whether the upland had any rights across the privately-owned tidelands.

If ownership of the tidelands was in the State of Oregon at the time of the acquisition of the upland, the upland owner, pursuant to long-standing legislation, has a preference in leasing or purchasing the tidelands if the State decides to lease or convey the tidelands. As stated, the statutory preference is the right to lease or purchase by offering an amount equal to the highest price offered in good faith.

Usually, although not in the case of log storage, the upland owner's access to the interior makes the possession or ownership of the tidelands more valuable to the upland owner than to anyone else and he can, in the exercise of good business judgment, match the amount bid by anyone else.

■ It should be remembered that the public has certain rights in the tidelands, the submersible lands, and the land below the low-water mark; this element of the State's interest is referred to as jus publicum, i.e., the right of public use. It is not necessary in the instant case to specifically define these public rights. See *Corvallis Sand & Gravel v. Land Bd.*, 250 Or 319, 439 P2d 575 (1968). In the newest treatise on the subject of water rights, 1 Clark (Editor-in-Chief), Waters and Water Rights, 247 (1967), the writer states: "jus publicum—i.e., the rights of the public to navigate, to fish, and to pass over the tidelands and submerged coastal lands, these being the principal public demands for the use of the seacoast."

As a consequence of our decision that the lessee of the tidelands has the right to moor logs below the low-water mark, we must consider the defendant's contention that the plaintiffs are not lessees because their bid and the lease made pursuant to such bid are invalid. Defendant charges that the bid and the lease

are conditional and, therefore, not in accord with the notice calling for bids.

The notice inviting bids described the land to be leased, specified the amount of the minimum bid which would be accepted, that the first year's rental must accompany the bid and that the lease would be for a period of five years. The plaintiffs' bid stated: "This offer is made with the understanding that we intend to use said lands and the adjacent waters for the purpose of mooring log rafts and other floating objects and that the lease shall provide that in the event a permit cannot be obtained for the erection of dolphins and piling for moorage purposes, the lease may be terminated." A lease between the State and plaintiffs containing a termination clause in accordance with the above-quoted offer, was executed.

■ The general rule is that in order for a bid to be acceptable it must substantially conform to the terms of the invitation for bids. 10 McQuillin, Municipal Corporations (3d ed 1966), 416, § 29.72, n 32; Annotation, "Bidder's variation from specifications on bid for public work," 65 ALR 835, 836 (1930). The reason for the rule is that there would be no price competition if all the bidders were not required to submit their offers with the same terms except for price.

The question is whether the variation from the terms of the invitation is substantial.

The invitation for bids specified that the lease would be for the term of five years. The bid was an offer to lease for five years; however, it further provided that it would terminate in less than five years if no permit to erect piling could be obtained. It can be considered either a lease subject to termination before five years, which was the form it took, or that it was

in essence, an offer to lease for five years if the Corps of Engineers would permit the driving of piling. It is immaterial which alternative is used.

■ We find that the variation was substantial and rendered the bid and the consequent lease invalid.

The conditional form of bid removed at least a part of the speculation from plaintiffs' offer. Other bidders, following the terms of the advertisement and making an unconditional offer, would have to consider the possibility that they might not get permission to drive pilings. It is true that removing the speculative nature of the bid would tend to increase the amount of the bid and thus be beneficial to the State, but permitting one bidder to remove the risk destroys competitive bidding.

*Claus v. Babiarz,* 40 Del Ch 500, 505, 185 A2d 283 (1962), involves a question similar to that in the instant case. The bidder made an offer for some property. It conditioned its offer "upon non-interference by the proposed FAI-2 Freeway Ramp with our means of access and egress to the motor hotel on Delaware Avenue." The court found this was a substantial variation and required a rejection of the bid.

Plaintiffs argue that the condition inserted in the instant case was reasonable and would have been implied in law if not incorporated in the bid and lease because everybody knew that all those bidding were only interested in securing log moorage. They contend that if a permit were not forthcoming the lease would be terminated even though it contained no such termination clause because the doctrine of frustration of purpose or supervening impossibility would have been applied.

We are of the opinion that such a condition would

not be implied in a lease of these premises and in the absence of such an expressed condition the lessee would be bound to pay the rent whether or not it was able to secure the necessary permit to drive piling.

In some instances the law excuses performance by a promisor when circumstances arise which make performance impossible or prevent the party from securing the object or effect which was the reason for entering into the contract. This second situation is referred to as "frustration" and is comparable to the situation in the present case; the whole purpose of the lease was to moor logs. If the Corps would not permit this, the lease was futile. In *Dorsey v. Oregon Motor Stages,* 183 Or 494, 502-504, 194 P2d 967 (1948), we gave approval to the doctrine that performance is excused under some circumstances when the result to be attained by entering into the contract is frustrated by supervening circumstances. *West Los Angeles Institute For Cancer Research v. Mayer,* 366 F2d 220 (9th Cir 1966), was governed by Oregon law and followed *Dorsey v. Oregon Motor Stages,* supra (183 Or 494).

Not in all cases, however, is performance excused if the attainment of the purpose of the contract or lease is frustrated. It has been stated that supervening circumstances which frustrate the purpose of the contract do not excuse performance if the occurrence of such circumstances could have been reasonably anticipated by the parties and could have been provided for by an express provision in the contract. 2 Restatement, Contracts § 457.① Williston questions the application

---

① This section concerns "impossibility" as distinguished from "frustration." Frustration is the subject of § 288, which is in the chapter on "Constructive Conditions and Failure of Consideration

of the doctrine of frustration only to supervening circumstances which should not have been reasonably anticipated. He reasoned: "Any kind of impossibility is more or less capable of anticipation." 6 Williston, Contracts (rev ed) 5476, § 1953. He points out that the possible destruction by fire of the subject matter of the contract can be anticipated and provided for in the contract, yet the cases generally hold that such destruction excuses performance despite the absence of any express contractual provision to that effect. We so held in *Eggen v. Wetterborg,* 193 Or 145, 237 P2d 970 (1951).

We do not need to decide in this case what kind of supervening frustrating circumstances should be anticipated and dealt with in express terms in the contract. In the instant case all parties were fully aware that permission to erect pilings and dolphins was necessary and that without such permission the mooring of logs was impossible. The circumstances here are analogous to those present when one desires to purchase land upon which to build a commercial building, and the land at the time of the contract to purchase is zoned only for residential construction, and the purchaser hopes to secure a zone change. Our experience is that in such a situation the purchaser usually expressly conditions his promise to pay upon a zone change being secured.[2]

---

in Promises For An Agreed Exchange," whereas "Impossibility" is the subject of a separate chapter. However, the comments to § 457 state the inter-relationship between §§ 457 and 288 and we can see no reason to distinguish "frustration" and "impossibility" for this purpose.

[2] Sales of liquor dispensing establishments are also usually expressly conditioned upon the Liquor Commission approving transfer of the license to dispense liquor. For example, Morrell v. Perlman and Ackerman, 206 Or 581, 294 P2d 319 (1956).

■ The contingency in the instant case, the securing of permission to drive pilings, like the necessity of a zone change to construct a building, is so obvious and material that the absence of any contractual provision concerning such contingency most probably indicates a willingness to assume the risk of the nonoccurrence of the contingency and an adjustment of the consideration to reflect this assumption of risk. This may have been reflected in the bids in the present case. The plaintiffs' bid with the express condition was for $15,000 per year for five years, whereas the defendant's unconditional bid was for $580 per year for five years.[9]

This same line of reasoning was stated by Mr. Justice Traynor in *Lloyd v. Murphy*, 25 Cal2d 48, 54, 153 P2d 47 (1944):

"'* * * The purpose of a contract is to place the risks of performance upon the promisor, and the relation of the parties, terms of the contract, and circumstances surrounding its formation must be examined to determine whether it can be fairly inferred that the risk of the event that has supervened to cause the alleged frustration was not reasonably foreseeable. If it was foreseeable there should have been provision for it in the contract, and the absence of such a provision gives rise to the inference that the risk was assumed.

"The doctrine of frustration has been limited to cases of extreme hardship so that businessmen, who must make their arrangements in advance, can rely with certainty on their contracts. (*Anglo-Northern Trading Co. v. Emlyn Jones and Williams*, 2 K.B. 78; 137 A.L.R. 1199, 1216-1221). The courts have required a promisor seeking to excuse himself from

---

[9] Undoubtedly, the amount of defendant's bid also took into consideration defendant's hope, or belief, that it already had the right to drive pilings as a riparian right appurtenant to its owning the upland.

performance of his obligations to prove that the risk of frustrating event was not reasonably foreseeable and that the value of counterperformance is totally or nearly totally destroyed, for frustration is no defense if it was foreseeable or controllable by the promisor, or if counterperformance remains valuable. * * *"

■ The securing of permission to drive piling would not have been implied as a condition in a lease or bid which contained no such express condition; therefore, plaintiffs conditioning their bid and their obligation as lessees on obtaining such permission was a material variance from the bid invitation, and the lease was consequently invalid. The plaintiffs having no valid lease and thus having no interest in any part of the lands or water involved cannot be declared to have the right to maintain structures on such land and in such water to moor logs.

Reversed.

LUSK, J., specially concurring.

I agree with the court's conclusion that the case is ruled by *Bowlby v. Shively,* 22 Or 410, 30 P 154.

The question of the respective rights of the upland owner and the state's lessee of the tidelands is, as the opinion of the court points out, a question of Oregon law. That law was long since established by legislation[①] and the opinion of this court in *Bowlby v. Shively,* and opinions to the contrary expressed by courts elsewhere or by textwriters, no matter how re-

---

[①] Laws 1872, 129; id. 1874, 77; id. 1876, 70. These statutes gave the upland owners a preference in the provisions for the sale of such lands, though the state was under no obligation to recognize any rights in the upland owners, Bowlby v. Shively, supra, 22 Or at 416; Lewis v. City of Portland, 25 Or 133, 161-162; 35 P 256, 42 Am St Rep 772, 22 LRA 736.

spected, are irrelevant in the present context. The principles announced in the *Bowlby* case, indeed, had been stated in prior decisions and, as Mr. Justice LORD said in the *Bowlby* case: "[T]he previous adjudications of this court * * * have become a rule of property." 22 Or at 427.

The *Bowlby* case holds that the state is the absolute owner of the tidelands with a consequent right to dispose of such title in such manner as it may deem proper, subject only to the paramount rights of navigation and commerce; that the right to build a wharf over the tideland is appurtenant to it and not to the adjacent land; and hence in a controversy between the upland owner and the state's lessee of the tideland involving such a right the lessee should prevail.

I think it should be emphasized that we are dealing with a rule of property and that *Bowlby,* as Justice LORD said of our prior adjudged cases, "should be regarded as settled law, which could not be disregarded without disturbing titles and bringing disaster perhaps upon those who had accepted and acted upon those decisions as the law of this state." 22 Or at 422. So, again, the court said at page 427:

> "From these considerations it results, if we are to be bound by the previous adjudications of this court, which have become a rule of property, and upon the faith of which important rights and titles have become vested, and large expenditures have been made and incurred, that the defendants [the upland owners] have no rights or interests in the lands in question.
>
> "Upon this point there is no diversity of judgment among us."

*Bowlby* was decided in 1892. Twenty years later Mr. Justice BURNETT, speaking for the court in *Cor-*

*vallis & Eastern R. Co. v. Benson,* 61 Or 359, 370, 121 P 418, said: "The controlling precedent in this State —the landmark to which all subsequent decisions of this court on this subject are referable—is the masterly opinion of Justice LORD, in *Bowlby v. Shively * * *."* He then quoted from the *Bowlby* opinion as follows:

"* * * 'When the State of Oregon was admitted into the Union, the tidelands became its property, and subject to its jurisdiction and disposal; that, in the absence of legislation or usage, the common-law rule would govern the rights of the upland proprietor, and by that law the title to them is in the State; that the State has the right to dispose of them in such manner as she might deem proper, as is frequently done in various ways, and whereby sometimes large areas are reclaimed and occupied by cities, and are put to public and private uses; state control and ownership therein being supreme, subject only to the paramount right of navigation and commerce. The whole question is for the State to determine for itself. It can say to what extent it will preserve its rights of ownership in them or confer them on others. Our State has done that by the legislation already referred to, and our courts have declared its absolute property in and dominion over the tidelands and its right to dispose of its title in such manner as it might deem best, unaffected by any "legal obligation to recognize the rights of either the riparian owners or those who had occupied such tidelands," other than it chose to resign to them, subject only to the paramount right of navigation and the uses of commerce.' * * *"

Justice BURNETT continued:

"* * * The principles announced in that case have never been disturbed by any decision of this court, and they are yet to be challenged by any ruling of the federal courts. They are part of the jurisprudence of the State, and have become a

settled rule of property. They constitute the foundation of many holdings, both great and small, and to overturn them now, if, indeed, they ever could have been disturbed, would be to invoke confusion where certainty ought to be thoroughly established." 61 Or at 371.

Since 1912 nothing has occurred—either by way of act of the Legislature or decision of this court—to disturb these principles. To my mind they establish a rule of property as firmly as anything in the law can be established. Their application makes imperative the decision of this court that the upland owner has no rights in the tidelands here in question except the right accorded by the Legislature to acquire an interest in the tidelands by meeting the bid of the highest bidder.

I also agree that the State Land Board could not, conformably to the principle that public bidding must be open to fair competition, accept the conditional bid of the plaintiffs, though I have no doubt that the Board has the authority to include such a condition in its advertisement for bids, and, had it done so, that the procedure would not for that reason have been assailable. The insurmountable difficulty, as I view it, lies in the fact that it was not the Board, but the plaintiffs which imposed the condition. The defendant was given no notice and could not properly be charged with notice that the attachment of a condition to a bid, substantially varying the term of the proposal, would be acceptable.

I am authorized to state that Mr. Justice McALLISTER concurs in this opinion.

PERRY, C. J., dissenting.

The majority apparently base their decision on the ground that the Board could not lawfully accept

the bid of the plaintiffs' because it did not substantially comply with the advertised call for bids. They rely upon 10 McQuillin, Municipal Corporations (3rd ed 1966) 416, § 29.72, note 32, and 65 ALR 835, 836 (1930).

These cases, with the exception of a single case, *Greenberg v. Fornicola,* 37 NJ 1, 178 A2d 339, which is contra to the majority opinion and will be later referred to, do not deal with the leasing of city owned property, but with compliance with bids for public improvements in which the call for bids must set forth in detail the specifications or requirements which a bidder must meet in constructing the project and which must be made available to the bidder by the city. In my opinion, cases involving calls for bids for public improvements are not applicable to the issue presented here.

Where the lowest responsible bids are sought for public improvements there is naturally the requirement that the municipality provide full, clear, definite, precise and specific specifications. *Baldwin-Lima-Hamilton Corp. v. Superior Court,* 25 Cal Rptr 798 (1962); *Bolton v. Gilleran,* 105 Cal 244, 38 P 881; *Bennett v. City of Emmetsburg,* 138 Iowa 67, 115 NW 582; *Ricketson v. The City of Milwaukee,* 105 Wis 591, 81 NW 864. This is so there may be a common standard as to quality to permit comparison as well as the price to be paid. *Konig v. M. & C. C. of Baltimore,* 126 Md 606, 95 A 478. Also, the purpose is to limit the discretion of officials which are susceptible to such abuses as fraud, favoritism, improvidence and extravagance. *Gale v. City of St. Paul,* 255 Minn 108, 96 NW2d 377. Therefore, it is clear that, while specifications advise the bidder, specifications are required for the protection of the public, not the bidder.

I agree with the majority that in testing calls for public improvement bids, "[t]he test of whether a variance is material is whether it gives a bidder a substantial advantage or benefit not enjoyed by other bidders." *Duffy v. Village of Princeton,* 240 Minn 9, 12, 60 NW2d 27, 29. For if a bidder receives a substantial advantage or benefit *not granted other bidders under the specifications submitted* the way is open for the abuses sought to be eliminated, and unduly restricts bidding. *Temple v. Portland,* 77 Or 559, 151 P 724. However, whether or not the bidder's proposal gives him an advantage is a *question of fact to be resolved in the light of all the circumstances. Bader v. Sharp et al.,* 36 Del Ch 89, 125 A2d 499.

It should be noted, in *Duffy v. Village of Princeton,* supra, 240 Minn 9, 14, 60 NW2d 27, 30, that the call for bids stated that "[a]s time is the essence of this project, the Contractor shall complete his work at the earliest possible moment, and shall plan the work so there is no unnecessary delays." The successful bidder stated in its bid that it would commence work within 10 working days and complete the project in 215 consecutive calendar days, unless there were unforeseen delays beyond its control. While this bidder placed upon itself a greater burden than the call for bids required, the court held this was not a material variance as *there was nothing in the call for bids that precluded other bidders from responding in the same manner.*

ORS 274.040, which authorizes the leasing of tide and overflow lands, so far as applicable to the issue presented, reads as follows:

"* * * tide and overflow lands owned by the State of Oregon may be sold or leased only to the

> highest bidder after being advertised not less than once each week for four successive weeks in two or more newspapers of general circulation in the state, one of which must be of general circulation in the county in which the lands are situated. \* \* \* "

It is to be noted, there are no requirements as to what the notice shall contain or terms or conditions that must be incorporated in the lease.

The offer to lease the land owned by a public body has for its purpose, as stated in the statute, the obtaining of the greatest return possible from the lease of the land consistent with its lawful use. Therefore, the need for full, clear, definite, precise and specific specifications as required in public construction and purchase offers is not required since the only comparison required of the public body is that it determine in good faith the greatest possible monetary return from the leasing of the land.

There were no specifications as to what would be required of bidders in the offer to lease; therefore, each bidder was at liberty to submit the terms upon which he would lease the property for the five-year term. See *Fereday & Meyer Co., Inc. v. Elizabeth Bd. of Public Works*, 27 NJ 218, 142 A2d 99.

I think it must be conceded that since the statute authorizing the leasing of the tide and overflow lands does not require any specific specifications to be set forth, as are required in other statutes for the leasing of state property, none are required. See ORS 274.765.

However, I do not wish to intimate that the legislature in not requiring specific specifications in the leasing of tide and overflow lands deprived the Board of its discretion in requiring such specifications if the

Board determined any to be necessary. The Board in this case decided none were necessary. But even if it be assumed that the call for bids was specific, plaintiffs' bid was responsive to the offer in every material matter.

The defendant, as the unsuccessful bidder, bid the minimum amount set forth in the call—$580 per annum or a total sum of $2,900 for the entire term.

The bid of the plaintiffs' was $15,000 per year, or a total of $75,000. Therefore, no matter how viewed the plaintiffs' bid was the highest offer.

The plaintiffs' bid is as follows:

"We hereby offer to lease from the State Land Board for a period of five years at a rental of Fifteen Thousand Dollars ($15,000) per annum the following described tide and overflow land located in Columbia County, Oregon:
[description omitted]

"This offer is made with the understanding that we intend to use said lands and the adjacent waters for the purpose of mooring log rafts and other floating objects and that the lease shall provide that in the event a permit cannot be obtained for the erection of dolphins and piling for moorage purposes, the lease may be terminated.

"We are inclosing herewith cashier's or bank manager's checks for the sum of Fifteen Thousand Dollars ($15,000) *in payment of the first year's rental.*" (Emphasis supplied)

The majority seem to hold, since the bid was made subject to an option to terminate the lease upon the happening of an uncertain event, it was a conditional bid and not an offer to lease for the full period.

The answer is to be found in the fact that plaintiffs' offer is for the full period unless an uncertain event occurs in the future.

ORS 91.020, which classifies tenancies in this state, sets forth, among others, a "tenancy for years," and "a tenancy from year to year."

ORS 91.060 defines a tenancy from year to year as where "[o]ne who enters into possession of real estate with the consent of the owner, and no certain time is mentioned, but an annual rent is reserved, is considered a tenant from year to year." Since the lease in question discloses a certain date for payment, the lease is not one from year to year.

No statute defines a tenancy for years, but it is well established that whenever a lessor grants in writing the possession and enjoyment of land to a lessee for a specified and definite period of years a tenancy for years is created.

The plaintiffs' bid states they are enclosing "payment of the first year's rental" which shows an intent to lease for the full period with only an option to terminate on the happening of a future event.

It is equally well settled that "[w]here a term for a fixed period is created by a lease, a provision for the termination of the lease on an event which may or may not happen before the expiration of the period specified will not prevent the creation of a valid term for years. The fact that a lease for a fixed period provides for its termination before the expiration of such period at the option of the lessor or the lessee will not prevent it from creating a valid term for years." 51 CJS 534, Landlord and Tenant § 27. See *Peoples Park and Amusement Ass'n v. Anrooney,* 200 Wash 51, 93 P2d 362.

In view of well-established law, I am at a loss to understand the contention of the majority that this was not an offer to enter into a five year lease. The

majority seem to argue that the offer is made "with the understanding * * * that in the event a permit cannot be obtained * * * for moorage purposes, the lease may be terminated" and that, therefore, the bid was conditional.

Again it must be noted that the offer is unconditional as to the first year's rental. The offer does not state that if the bidder is unable to obtain the permit the lease is to be cancelled as though never entered into and that the bidders are entitled to a return of the money advanced. The bid only requests the right of future cancellation.

A truly conditional bid is to be found in *Claus et al v. Babiarz et al,* 40 Del Ch 500, 507-508, 185 A2d 283, 287, relied upon by the majority, and it is not in point under the facts of our case. In *Claus* the bid was for the purchase of real property and as stated by the court, "[t]he effect of the condition * * * is to provide *an avoidance of the bid upon the happening of a contingency* * * *. Moreover, in the bid the limitation is referred to as a condition, the happening of which *will avoid the bid.*" (Emphasis supplied.)

As pointed out, in the matter before us the bid is unconditional.

Another answer to the result reached by the majority is that there is set forth in the call for bids no exact specifications as to the terms of the lease other than monetary which may be acceptable to the Board or otherwise the bid will be rejected. The defendant does not question the specifications set forth in the call.

Where the specifications in the call are not questioned, an unsuccessful bidder may not complain that he was injured because of a matter inserted by another bidder.

In *Fereday & Meyer Co., Inc. v. Elizabeth Board of Public Works,* supra, 27 NJ 218, 142 A2d 99, 100, the city advertised for bids to perform garbage collection. The former calls had required the bidder to maintain a dumping ground "within the city or within five miles," but this solicitation for bids did not. The successful bidder's dumping grounds were beyond the five miles. The court held, since there was no complaint that the specifications were not satisfactory, that the unsuccessful bidder could not complain.

Also, as pointed out in *Duffy v. Village of Princeton,* supra, the specifications in the call were silent as to the date of completion and the insertion in the bid of an approximate completion date was not a material variance.

Again, in *Greenburg v. Fornicola,* 37 NJ 1, 178 A2d 339, 341, 342, the city advertised for bids for the leasing of space in a pavilion owned by the city. The advertisement permitted the bidder to suggest some other line of business other than those proposed by the city, subject to the approval of the city. It was contended by the unsuccessful bidder that "the provision permitting a bidder to suggest a line of business enabled each bidder to fix his own standard," and violated the requirement that "a public body shall prescribe a common standard on all matters that are material to the proposals, to the end that interested persons may bid intelligently and will be induced to bid by a promise of impartiallity." This contention was sustained by the appellate division, but reversed on appeal. Mr. Chief Justice Weintraub, writing the opinion of the Supreme Court, said:

> "Plaintiff argues * * * that a limitation upon use is compatible with the bidding statute

only if the acceptable uses are specified in the proposal for bids, and hence a proposal for any use, subject to disapproval, violates the statutory policy. *The statute does not express that distinction and we should not find it by implication.*

"A private owner would hardly take the route urged by plaintiff. * * * It thus comports with the statute unless it is so beset with the prospect of evil that we must find incompatibility on that account.

"The bidding statute seeks to prevent a predetermined result for a favored bidder. We see no special prospect of this evil in a proposal for bids for any use, subject to disapproval * * *." (Emphasis supplied.) *Greenburg v. Fornicola,* supra, 37 NJ 1, 7-8, 178 A2d 339, 342.

The same may be said of the matter before us. The statute does not attempt to set forth any requirements as to use or length of required occupancy. The only requirement is that the lease be let to the highest bidder. The highest bidder in this case was the plaintiffs. Their bid to pay and the payment of $15,000, made at the execution of the lease, for a period of one year was more than five times the bid of the defendant for the full five years, even if a future event permitted the plaintiffs to exercise the option to terminate at the end of one year. Termination at the end of one year would have been a benefit to the people of the state for the Board would have been able to again lease the property.

The reference by the majority to the fact that defendant by its bid expressed a greater "willingness to assume the risk of the nonoccurrence of the contingency and an adjustment of the consideration to reflect this assumption of the risk" than did the plaintiffs is a shibboleth.

This is clearly reflected in the fact that, although the defendant was offered the right to a lease upon the same terms as that of the plaintiffs, the defendant rejected the offer. And further, the defendant stated its purpose in leasing the land was the same as that of the plaintiffs. Therefore, I am unable to distinguish, as does the majority, between a bidder who offers more and assumes the risk of a greater loss in the first year of the contract, and one who assumes a very much smaller loss over the entire term.

The sole duty placed upon the Board by the statute was to advertise for bids and to accept the highest bid. The highest bid, whether it be considered an absolute bid for only one year or for the five year term, was made by the plaintiffs. Certainly this court should not read into the statute requirements which are not there in the absence of some showing that not to do so would create a great evil that would result in loss to the public.

Regardless of all else, this matter was heard as a matter in equity and equitable principles apply.

The defendant was granted by the trial court the right to lease the property involved upon the exact same terms as those granted the plaintiffs and defendant rejected the offer. Therefore, in my opinion, the defendant is not in a position to complain.

To me it is unconscionable for this court to set aside the lease entered into between the Board and the plaintiffs.

In the light of all the facts, that this was a lease of land and from all the circumstances it is clear the plaintiffs' bid did not result in plaintiffs receiving any advantage over any other bidder, I would affirm the decree of the trial court.

SLOAN, J., joins in this dissent.