Argued September 21; affirmed November 30, 1943

\* HOFF ET UX. *v.* PENINSULA DRAINAGE
DISTRICT NUMBER 2 ET AL.

(143 P. (2d) 471)

---

\* See also page 626 for connected case.

Before BAILEY, Chief Justice, and BELT, ROSSMAN, KELLY, BRAND and HAY, Associate Justices.

*Elton Watkins,* of Portland, for appellants.

*R. K. Powell,* of Portland (Ivan F. Phipps and Maguire, Shields, Morrison & Biggs, all of Portland, on the brief) for respondents.

BAILEY, C. J. This action was brought by Henry Hoff and Edith Hoff, his wife, against Peninsula Drainage District No. 2, a corporation, Tony Fazio, T. G. Donica and J. H. MacKenzie, directors of that district, and Winfred S. Copeland and R. Rierson, employees of the district, to recover damages alleged to have been suffered by the plaintiffs due to fraud and deceit of the defendants in the acquisition by the defendant corporation of a right of way and easement across the plaintiffs' land.

Separate demurrers of the corporate defendant and R. Rierson to the second amended complaint were sus-

tained, and upon the election of the plaintiffs not to plead further, separate judgments dismissing the action as to those two defendants were entered by the Honorable Alfred P. Dobson. Against the remaining defendants the cause proceeded to trial to a jury before the Honorable Louis P. Hewitt, and at the close of the plaintiffs' evidence a judgment of involuntary nonsuit was entered. From the latter judgment and from that dismissing the action as to the drainage district the plaintiffs have appealed.

The second amended complaint alleges that the plaintiffs are the owners of certain described land [amounting to approximately 3.82 acres] in Multnomah county, adjacent to "an arm of the Columbia river known as Columbia slough"; that the defendant corporation was "organized and existing under the laws of the state of Oregon" providing for the incorporation of drainage districts; and that the three individuals first named were directors of that corporation and the other two were its agents and servants. It then asserts that on or about April 19, 1939, the plaintiffs executed and delivered to the district as grantee "their deed of conveyance for a right of way and easement across the aforesaid" land; and that the plaintiffs "executed and delivered the said deed of conveyance without any consideration therefor, because of the deceitful and fraudulent representations of the defendants."

The "deceitful and fraudulent representations" are alleged to have been statements made by the individual defendants to the plaintiffs, to the effect:

"(1) * * * that the said drainage district, its employees, agents and servants, in the exercise and use of the rights of easement in or on the here-

inbefore described land of plaintiffs, would not do or perform any work on the said premises or the waters of Columbia slough that would be harmful to, impair, lessen or diminish the riparian rights of the plaintiffs in any of their lands and the waters of said Columbia slough, and the use and value of any of said lands, and the uses, benefits and values of their lands from and because of the surface seepage and underground flow of any waters from said Columbia slough, that the plaintiffs had enjoyed by reason of their rights as riparian owners, in and to the waters of said Columbia slough.

"(2) That no alteration or excavation on or use of plaintiffs' said lands would be made except to fill some depressions on low spots on each side of said dike with soil taken from the land between the dike and the said slough, and to make the slope of the water side of said dike an easy, gradual and uniform grade from the top to the water's edge.

"(3) That none of plaintiffs' lands would be appropriated.

"(4) That no improvements on plaintiffs' lands would be destroyed."

The plaintiffs then allege that such representations of the defendants were "false, fraudulent and made recklessly and with knowledge of the falsity of the same, and were made with the intent to deceive the plaintiffs, to induce the plaintiffs to execute said deed without paying any consideration, . . . and were well known by the defendants to be false, in this" (1) that prior to "the time of making the said representations, the defendants had caused surveys and plans to be made that provided for the doing of injuries to the premises of the plaintiffs, as hereinbefore alleged, all of which the defendants concealed from the plaintiffs"; and (2) that such representations were either known by the defendants to be false and were wilfully

made by them for the purpose of deceiving the plaintiffs and inducing them to execute the conveyance without consideration, or were made recklessly and without regard to the truth thereof, inasmuch as "the defendants either knew of the work to be performed on plaintiffs' lands, or concerning which the defendants could have acquired knowledge and information from the survey" and plans previously made for the drainage district.

They further aver that their land was embraced within the drainage district; that at the time the representations were made to them by the defendants the plaintiffs believed that the same were true and "that the defendants were acting in the interest of and for the benefit of plaintiffs and all other land owners in said drainage district with honest purpose and in good faith"; and that the plaintiffs did not know that the representations made to them were false, did not know of the surveys or plans of the defendants, believed such representations to be true and relied upon them.

The gravamen of the second amended complaint is that sometime between January, 1940, and July of that year, the defendants entered upon the plaintiffs' land and built a new dike on a part of it other than that theretofore covered by a former dike, and in so doing removed soil from part of the land and deposited a large amount of soil on other parts, and thereby rendered one-half acre of plaintiffs' land unfit for cultivation or use; that the defendants cut down a large ornamental shade tree, destroyed bearing cherry trees and raspberry vines on plaintiffs' land and caused the plaintiffs to remove a wire fence and to move an irrigation pipe line; and that the "said defendants constructed along plaintiffs' land a drainage ditch and con-

duit that has injuriously affected the riparian rights of the plaintiffs by diverting from their lands all seepage and sub-irrigation flow of waters which prior thereto provided water sufficient to grow good grass and crops thereon, and by reason thereof has rendered their lands arid and barren and incapable of growing grass and other crops without surface irrigation of the same.'' In concluding this pleading the plaintiffs allege that by reason of the acts of the defendants the plaintiffs have suffered damages aggregating $10,100, of which the sum of $2,000 represents ''injury and damage to plaintiffs' riparian rights by lessening and cutting off sub-irrigation and seepage to plaintiffs' lands by construction of a drainage pipe system along and on plaintiffs' lands''.

Prior to the ruling by the court on the demurrer. of the drainage district, the parties entered into a stipulation reading in part as follows:

''. . . That the second amended complaint of the plaintiffs be deemed amended without the necessity of verification by the addition of an allegation thereto to the effect that the plaintiffs do not, by their second amended complaint, contend that the terms of the written easement therein referred to were violated by the defendant, except that they do assert that the provision of paragraph 2, on page 2 thereof,

'' 'That the rights and privileges granted by this instrument, if same cover lands adjoining any rivers or navigable lakes, shall not affect the riparian rights of the said parties of the first part in and to the use of the waters thereof'

was violated by the things alleged in the second amended complaint to have been done by the defendants.''

■ The demurrer to the second amended complaint raises the question of whether that pleading states facts sufficient to constitute a cause of action. According to our construction of the second amended complaint as amended by the stipulation, the plaintiffs concede that the instrument of conveyance from themselves to the drainage district permitted the district to do everything that it did in connection with the plaintiffs' land except to interfere, if in fact it did interfere, with the plaintiffs' riparian rights to the use of the waters of any river or navigable lake adjacent to their land. The provisions of the conveyance, except as quoted in the stipulation, are not set forth in the second amended complaint, nor is a copy of the instrument attached to that pleading as an exhibit.

In this proceeding the plaintiffs do not seek to set aside the instrument of conveyance, nor do they seek to have it reformed. Nowhere in the second amended complaint is it alleged that the plaintiffs or either of them failed to read the document or that its contents were misrepresented to them by the defendants, or that the plaintiffs did not agree to all its terms and provisions. They affirm the conveyance and seek to recover damages for alleged misrepresentations made by the defendants to them prior to the execution of the conveyance.

The representations alleged to have been made were of a promissory nature; that is, as to the uses which the district would or would not make of the land. Those representations, except possibly as to preserving the plaintiffs' riparian rights, were inconsistent with the provisions of the instrument of conveyance.

■ The plaintiffs are here attempting to vary the terms of the written agreement between themselves

and the district, by alleging oral promises made before the execution of the instrument. They would add to the agreement conditions which it did not contain when executed. Inasmuch as the contract between the parties has been reduced to writing, and the rights granted by the plaintiffs to the defendant district are specified in the agreement, the plaintiffs can not vary or alter the contract by showing contemporaneous or prior parol stipulations inconsistent with the terms therein contained, in view of the fact that they do not allege that they did not know the contents of the document before signing it or that the contents were misrepresented to them: *Western Oregon Trust Company v. Hendricks,* 77 Or. 104, 114, 150 P. 753; *Southern Pacific Company v. Erickson,* 103 Or. 311, 316, 204 P. 942; *Chattanooga R. & C. R. Co. v. Warthen,* 98 Ga. 599, 25 S. E. 988; *J. B. Colt Co. v. Moran,* 226 Ky. 479, 11 S. W. (2d) 147.

■ In the instrument of conveyance was this provision: "That the rights and privileges granted by this instrument, if same cover lands adjoining any rivers or navigable lakes, shall not affect the riparian rights of the said party of the first part in and to the use of the waters thereof." The plaintiffs assert that this provision of the conveyance has been violated by the defendants. If so, the plaintiffs' remedy would be by way of an action for breach of contract, and not an action for fraud and deceit. We do not believe, however, that the allegations of the second amended complaint are sufficient to state a cause of action for breach of the contract in regard to the plaintiffs' riparian rights.

■ Riparian rights of owners of lands adjacent to navigable waters are, in general, the following: (1) the right of access to the water, (2) the right to build a

pier out to the line of navigability, (3) the right to accretions, and (4) the right to a reasonable use of the water as it flows past the land: 45 C. J., Navigable Waters, § 143, at page 491.

■ It is not alleged that any of the foregoing rights of the plaintiffs as riparian owners were interfered with by the defendants. It is, however, asserted that the building of the dike caused the diversion from the plaintiffs' land of "all seepage and sub-irrigation flow of waters which prior thereto provided water sufficient to grow good grass and crops" on the plaintiffs' land. In our opinion, the reservation of riparian rights to the plaintiffs was not intended to assure them non-interference with the seepage and percolation of waters to and upon their land. This view is fortified by the fact that the very purpose of constructing drainage dikes is to direct and control the flow of water, whether surface, flood or seepage.

■ It is our conclusion that the circuit court did not err in sustaining the drainage district's demurrer to the second amended complaint.

We shall next consider whether error was committed by the trial court in granting the motions of the defendants MacKenzie, Donica, Fazio and Copeland for involuntary nonsuit. It will be remembered that the first three individuals named were the directors of the drainage district, and the fourth, Copeland, was an employee of the district.

Mr. Hoff's attention was directed to the plaintiffs' exhibit No. 2, which was an instrument of conveyance by the plaintiffs to the defendant district of an easement and right of way "to build, construct, reconstruct, and repair levees, embankments, revetments, canals

and any incidental works appurtenant thereto, upon, over and across the lands'' of the plaintiffs. He was then asked how he ''came to sign'' that document, and answered that Mr. Rierson came to his place, handed the paper to him and asked him to sign it. Mr. Hoff asked Rierson, he testified, whom he represented, and requested that he show his credentials. Rierson ''reached into his pocket and he pulled out a document and I saw the directors' names on it.'' Rierson then handed the instrument to Hoff, and he read it. That meeting was on Saturday, and because Hoff did not then have time to discuss the matter fully with Rierson, the latter left, and returned on Monday, at which time, according to Hoff's testimony, the following conversation was had:

> ''I said, 'Have you got any tracings or any blueprints to show what you will do with the dike?' I said, '.Did the directors send you here to get an easement and you don't have a plan showing what you intend to do?' And he said, 'The Army engineers are not through with it,' and I said, 'What are you going to do with this dike? Where are you going to get the dirt?' And he said they would get the dirt from the ledge on the water side, and make a gradual slope from the top of the dike to the water edge, and the reason was that the original formation was not doing us any good or any harm and they would use that to fill in the low spots on the dike, and I said, 'Is this all you are going to do?' And he said, 'Yes.' I said, 'Will we lose any ground if you do that?' And he said, 'No.' I said to my wife, 'If this man is telling the truth, it isn't going to harm us anything and it may help some of the neighbors.' He said this dike is a community affair and if they need any right of way, it is up to them to buy it, and I took him at his word and signed it and that was the only reason we ever signed it.''

He further testified that "Rierson said we would not be damaged in any way, and when I asked him for documents to show who he was or who he represented, he showed them to me and I was satisfied he did represent the drainage district." Mrs. Hoff stated that Rierson came to the plaintiffs' home and stayed a few minutes, "and I heard him say they were going to take the high spots and fill in the low spots and they would take the dirt from the slough side and if they did not have enough, they would haul it in." The foregoing constitutes all the testimony concerning the representations made by Rierson.

The instrument presented by Rierson was dated April 20, 1939. Shortly after the plaintiffs signed the conveyance the defendant Copeland called on Mr. Hoff at his place of employment, during the lunch hour, and presented to him another instrument of conveyance (which was a duplicate of the one he had already signed), and requested Hoff to sign it. Concerning the second instrument, Hoff testified as follows:

"... I said, 'What is that for?' I understood it was a quitclaim deed, and I said, 'I am not in position to give anybody a quitclaim deed,' and I said, 'What is that for?' And he said, 'That is for the government, and in case of any damage or lawsuit arising from this work they do not want to be held responsible,' and I signed it, not seeing a map or anything."

The only testimony in regard to Copeland's part in the negotiations was that given by Hoff, who stated that Copeland made no representations as to what use the defendant district would make of the plaintiffs' land. Prior to the signing of the two instruments the plaintiffs had not had any discussion with any of the directors concerning the granting of an easement or

right of way by the plaintiffs to the defendant district. It is not claimed by the plaintiffs that any of the alleged misrepresentations set forth in the second amended complaint were made by the directors or any of them to the plaintiffs.

Sometime in 1940, the year after the instruments were signed by the plaintiffs, Mr. Hoff had a conversation with Mr. Fazio, one of the directors of the drainage district. Present also at that meeting was Mr. Merlevede, an owner of property within the drainage district. A question arose as to the possibility that defects might develop in the ditch. Mr. Merlevede asked Fazio, Hoff stated, "why they didn't call a meeting and tell us what would be done instead of making a lot of promises and then not keep them, . . . and when we got down to the slough I asked why they didn't do that and he said they didn't, and the other directors didn't have time, and he said they hired these men to go out and get these easements and use any method they seen fit." Mr. Merlevede gave the following testimony concerning the discussion had by himself, Fazio and Hoff:

> "We argued so much about why they did that, and he said the Army engineers would not let it go through unless he got the easements and he instructed his agents to go ahead and get the easements, he didn't care how they got them, that was all they [the directors] were interested in.
>
> * * *
>
> "Q. Did he say who he talked to about getting the easements?
> "A. Yes, Mr. Copeland. He was the man he was referring to."

■ Mr. Rierson, who made the representations to the plaintiffs upon which they claim that they relied and

which, they say, induced them to execute the conveyance in question, was eliminated as a party litigant prior to the trial. Mr. Copeland, who prevailed upon the plaintiffs to sign the duplicate instrument, made no representations other than that the easement was required by the federal government in order to avoid liability for any damage that might occur. It is not claimed that such representation was untrue, or that the plaintiffs were injured because they relied upon it. It is therefore apparent that the plaintiffs failed to prove a cause of action against the defendant Copeland.

This leaves for determination the question whether the three directors or any of them are liable for the representations made by Rierson. As to this feature of the case, in view of the conclusion which we have reached, we are not called upon to decide whether such representations were or were not fraudulent. However, for the purposes of this discussion we shall assume that they were fraudulent.

 The employees of a corporation are not the agents of the directors, but of the corporation itself: *Antin v. Union High School District,* 130 Or. 461, 472, 280 P. 664, 66 A. L. R. 1271. Directors who do not participate in or authorize the making of fraudulent representations are not chargeable with fraud: *McFarland v. Carlsbad Sanatorium Co.,* 68 Or. 530, 536, 137 P. 209, Ann. Cas. 1915C, 555; 1 Cook on Corporations, Fifth Edition, § 158, p. 331; *Mohney v. Davis,* 104 Wash. 209, 176 P. 31. In the case before us there is no evidence that the directors in any way participated in the representations made by Rierson to the plaintiffs or that they authorized or even knew of them. The statement attributed to Fazio as made a year or so after the execution of the instrument could not in any way bind

or affect the other two directors, and as far as Fazio is concerned, the remark quoted was too vague to prove that he authorized Rierson to make misrepresentations or otherwise deceive the plaintiffs. Moreover, Merlevede testified positively that when Mr. Fazio made the statement he was referring to Copeland.

■ The plaintiffs made an offer of the testimony of four witnesses, who, if called, would say that Mr. Copeland made to them representations similar to those Hoff claimed were made to him by Rierson. In the offer of proof it was stated that the representations by Copeland were made at about the same time as those made by Rierson, and that they were made to the four witnesses, who were owners of land within the drainage district and had executed to the defendant district conveyances of easement and right of way across their lands. An objection by the defendants to that offer of proof was sustained by the court, and as to such ruling the plaintiffs assign error.

It has been noted that Mr. Copeland made no representations to the plaintiffs, hence what he may have said to other landowners could not affect his liability in this action. Moreover, the corporation and Rierson were not before the court in the trial on the merits, and therefore the proffered testimony could not affect them. In addition, the directors are not shown to have had any knowledge of the representations made by Rierson and Copeland. We are of the opinion that the admission of the proffered testimony was at most discretionary with the trial court, and that no abuse of discretion is shown.

The judgment entered on the order sustaining the demurrer and the judgment of involuntary nonsuit are affirmed.