Argued and submitted July 19, reversed and remanded November 23, respondent Charles R. Markley's petition for reconsideration filed December 6 and appellants' response to petition for reconsideration filed December 13, 2011, allowed by opinion February 15, 2012
See 248 Or App 180, 274 P3d 858 (2012)

Tyrone CRUZE, Sr.
and Jacqueline Cruze,
Trustees of The Tyrone Cruze, Sr.
and Jacqueline Cruze Family Trust Agreement
Dated March 6, 1987;
and California National Bank
Custodian FBO Tyrone Cruze IRA Acct CCT0300
and Custodian FBO Jacqueline Cruze IRA Acct CCJ0150,
*Plaintiffs-Appellants,*

*v.*

Martin L. HUDLER,
an individual;
and Charles R. Markley,
an individual,
*Defendants-Respondents,*
*and*

Covenant Partners, LLC,
a Nevada limited liability company,
*Defendant.*

Clackamas County Circuit Court
CV08090688; A145179

267 P3d 176

Steven L. Naito argued the cause for appellants. With him on the briefs was Tarlow Naito & Summers, LLP.

Brian R. Talcott argued the cause for respondent Martin L. Hudler. With him on the brief was Dunn Carney Allen Higgins & Tongue LLP.

Jeffrey W. Hansen argued the cause for respondent Charles R. Markley. With him on the brief were Joseph A. Rohner IV and Smith, Freed & Eberhard, P.C.

Before Schuman, Presiding Judge, and Brewer, Chief Judge, and Wollheim, Judge.*

SCHUMAN, P. J.

---

* Brewer, C. J., *vice* Nakamoto, J.

## SCHUMAN, P. J.

Plaintiffs brought this action against two defendants, Martin L. Hudler and Charles R. Markley, who allegedly defrauded them by means of an investment scheme. The trial court granted summary judgment in favor of Markley on all of plaintiffs' claims, and refused to allow plaintiffs to amend their complaint to allege a racketeering claim against either defendant. Plaintiffs now appeal, arguing that the court erred in granting Markley's motion for summary judgment and in denying plaintiffs' motions to amend their complaint. We agree with plaintiffs in both respects, and we therefore reverse and remand.

## I. SUMMARY JUDGMENT

We begin with plaintiffs' contentions regarding the trial court's grant of summary judgment on their claims against Markley. In reviewing the grant of such a motion, "[w]e take the facts from the summary judgment record and view those facts and all reasonable inferences that may be drawn from them in the light most favorable to plaintiff[s], the nonmoving party." *Morehouse v. Haynes*, 350 Or 318, 320, 253 P3d 1068 (2011).

Plaintiffs Tyrone and Jacqueline Cruze[1] owned development property in Oregon and listed that property with Pat Jay, a real estate broker. In early 2007, Hudler contacted Jay about purchasing some of plaintiffs' property. Hudler visited plaintiffs' Idaho home in May to discuss that prospective purchase. During the visit, Hudler described a real estate development business that he and Markley owned. Hudler represented that he was an experienced and successful real estate developer and that Markley was an "experienced lawyer." Hudler told plaintiffs that he and Markley had a portfolio of successful projects in Nevada, Oregon, and California, and he invited Tyrone Cruze to come to Reno, Nevada, to see some of those projects.

---

[1] Plaintiffs are the trustees of the Cruze family trust, and the California National Bank, custodian of the Cruzes' individual retirement accounts. For clarity, we refer to the Cruzes and "plaintiffs" interchangeably for purposes of this appeal.

On May 30, 2007, Tyrone Cruze sent Jay to Reno on his behalf to see the real estate projects and gauge how successful they were. Hudler and Markley met Jay in Reno and showed him eight real estate projects. Jay gave a positive report of the visit, and over the summer Tyrone Cruze met with Hudler and Markley at Hudler's office. During that meeting, Hudler explained that Markley, his partner, was an owner of one of the biggest law firms in Portland. Hudler also told Cruze about other successful projects that Hudler and Markley were working on, including a development with Robert Praegitzer, a businessman Cruze respected. Markley "heard everything [Hudler] said as he was sitting in the same room."

Hudler visited plaintiffs several more times in the fall of 2007 and ultimately convinced them to form a joint venture with Bridgeport Communities, LLC (Bridgeport), a limited liability company owned by Hudler and Markley, to develop plaintiffs' Oregon property.[2] To that end, Bridgeport and plaintiffs formed four separate limited liability companies—the "JTB Equities" companies.

Bridgeport, meanwhile, also owned all of the membership interests in Covenant Partners, LLC, a company that served as the "operations manager" for Keycom, a company that, in turn, was to develop a parcel of property in Nevada known as the "Keystone Property." In March 2008, Hudler approached Tyrone Cruze about investing in Covenant. On March 19, Markley prepared a First Amended and Restated Operating Agreement of Covenant Partners, LLC, which Hudler then took to plaintiffs' home in order to finalize the investment. Hudler represented to plaintiffs that the investment was needed immediately because two loans related to and secured by the Keystone Property were in default. While at plaintiffs' home, Hudler spoke with Markley by phone and made changes to the operating agreement.

---

[2] Technically, Hudler and Markley owned Bridgeport Group, LLC, which in turn owned Bridgeport Communities. To avoid confusion—to the extent that is possible in this case—we refer simply to Bridgeport unless the context requires further specificity.

The following day, Hudler and plaintiffs executed the Covenant Operating Agreement, whereby plaintiffs purchased half of Bridgeport's interest in Covenant. In Section 2.1.2 of the Agreement, Bridgeport warranted that it had previously "contributed cash to or on behalf of Covenant in the amount of $1,026,298 through and including December 31, 2007 * * *." As part of the purchase, plaintiffs agreed to pay Bridgeport $513,149—that is, half of the $1,026,298 that, according to Section 2.1.2 of the Agreement, Bridgeport had already contributed—plus an amount equal to one half of Bridgeport's previous contributions to Covenant between January 1, 2008 and March 20, 2008, the date of the agreement. Plaintiffs also agreed to loan $3,330,000 to Keycom and to make additional capital contributions. Hudler represented to plaintiffs that the loan to Keycom would be secured by a first priority trust deed on 40 acres of the Keystone Property.

Shortly after executing the Covenant Operating Agreement, plaintiffs paid the agreed $513,149 to Bridgeport. Hudler then requested a capital contribution of $160,000 to Covenant, pursuant to the agreement, and plaintiffs made that additional capital contribution the next day. Near the end of April 2008, plaintiffs also loaned just over $3 million to Keycom.

According to plaintiffs, their investment in Covenant was actually part of a fraudulent "Ponzi-like scheme" whereby Hudler and Markley operated businesses without profit, commingled funds of related companies, and raised new funds to repay earlier investors and hide the lack of profits. Companies owned by Hudler and Markley were, indeed, shuffling money among themselves. One of those companies, Mill Creek Equities, LLC (Mill Creek), owned by Hudler and Markley and their wives, in turn owned a minority interest in LMA Northwest Fitness LLC and LMA Northwest Retail LLC (the LMA companies). Hudler and Markley had access to the bank accounts of the LMA companies, and Mill Creek took nearly $800,000 from those companies without their controlling shareholders' knowledge or permission. Meanwhile, Hudler was using money from other companies—such as Keystone's loan proceeds—to borrow himself or to pay Bridgeport. (By way of example: Two days after receiving

loan proceeds from Keystone, Bridgeport deposited $500,000 into an account for one of the LMA companies, which was then credited to Mill Creek.) Hudler later took $99,885.00 of an earnest money deposit to Keycom and put that deposit in Bridgeport's bank account as well.

At the same time, Hudler was diverting money from Bridgeport Construction Group, yet another company that Hudler and Markley formed in connection with their property development efforts. Bridgeport Construction Group was the general contractor for a townhome project that Bridgeport was developing with Chris and Heather Harrell. Between December 2007 and March 2008, Hudler had diverted more than $250,000 in construction loan proceeds to himself and other entities that he and Markley owned or controlled. In mid-March 2008, Chris Harrell confronted Hudler and demanded that the money be returned and threatened to contact the police.

Those convoluted intercompany dealings (and the fact that Hudler and Markley's various development companies were operating with very little cash), coupled with Harrell's demands, created an immediate need for a further influx of capital to Hudler and Markley's operations. The Cruzes were one potential source. On March 19, 2008—the day that Hudler arrived at plaintiffs' house to finalize the Covenant Operating Agreement—Bridgeport's bookkeeper e-mailed Hudler a list of the balances in the accounts of Hudler and Markley's limited liability companies (as well as other accounts) showing just over $5,000. The e-mail states, "Here are the current balances in the accounts. *Am robbing Peter to pay Paul when necessary. Any update on Cru[z]e Wire?*" (Emphasis added.)

Plaintiffs were not told that their investment was needed, in part, to pay off Bridgeport Construction Group, but that is what happened, albeit in a roundabout way. On March 25, 2008, the same day that plaintiffs wired $513,149 to Covenant's bank account, Covenant transferred $331,000 to Hudler's personal bank account and another $7,200 to Bridgeport Construction Group. Also that day, from his personal account, Hudler transferred another $81,000 to Bridgeport Construction Group, and approximately $90,000

to other companies. Those other companies, still on March 25, used the money they received from Hudler to pay Bridgeport Construction Group. All told, Bridgeport Construction Group received $147,100 from Hudler and Markley's companies on the day that plaintiffs invested in Covenant.

Plaintiffs later discovered that, in addition to failing to disclose that their investment in Covenant would be used to pay off Bridgeport Construction Group, Hudler had made a number of inaccurate representations while courting plaintiffs. Those misrepresentations included (1) that a businessman plaintiffs respected, Robert Praegitzer, was an investor with Hudler and Markley, despite the fact that that investment relationship with Praegitzer had already been severed; (2) that Hudler and Markley owned or were in the process of acquiring certain properties in Reno that they had never owned or had been forced to sell; (3) that Hudler and Markley had contributed $1,026,298 to Covenant for entitlement costs, as represented in Section 2.1.2 of the Covenant Agreement, when that figure was actually closer to $430,000; (4) that the plaintiffs' loan of more than $3 million to Covenant would be secured by a first priority trust deed on 40 acres of the Keystone Property; and (5) that Hudler and his wife had a net worth in excess of $30 million, as shown on a financial statement that Hudler faxed to plaintiffs.

Plaintiffs' operative complaint alleged various claims against both Hudler and Markley, four of which are relevant to plaintiffs' first assignment of error: (1) common-law fraud against both defendants; (2) Oregon securities law violations against both defendants; (3) a "joint liability" claim against Markley based on Hudler's conduct; and (4) elder abuse claims against both defendants.[3]

Defendants separately moved for summary judgment on all claims. The trial court, in a written opinion, denied Hudler's motion for summary judgment but granted Markley's. As to Markley, the trial court ruled that plaintiffs had failed to demonstrate a genuine issue of material fact on

---

[3] Plaintiffs also alleged a derivative claim as members of Bridgeport seeking to pierce the corporate veil as to Hudler and Markley. The trial court denied defendants' motions for summary judgment on that claim, a ruling that is not at issue on appeal.

any of the claims. Specifically, the trial court ruled, as to the fraud claim, that

> "[i]t is beyond any doubt Markley was not the speaker of any statement relating to development experience, ownership of property, or plans for future developments in either Nevada or Oregon. Markley's only contact with any of the fraud claims relates to his drafting of the Covenant Partners Restated Operating Agreement. The uncontroverted evidence establishes Markley received the figure in question from others and acted as a scrivener as to that number. Plaintiffs' attempts to create an issue of fact by suggesting a fact finder could make reasonable inferences falls well short and is in the nature of pure speculation."

The court granted Markley's motion for summary judgment on the other claims (securities law, joint liability, and elder abuse) for similar reasons—broadly, that there was no evidence that Markley himself made any misrepresentations to plaintiffs.

In their first assignment of error, plaintiffs argue that the trial court erred in failing to give them the benefit of all available inferences regarding Markley's knowledge of and involvement in the scheme to defraud them. For the reasons that follow, we agree with plaintiffs and therefore reverse the trial court's grant of summary judgment on their claims against Markley.

We begin with plaintiffs' common-law fraud claim, because the facts relevant to that claim govern our analysis with respect to the others. In order to recover on a common-law fraud claim, a plaintiff must prove that the defendant made a misrepresentation "intended to deceive the victim or acted in reckless disregard for the truth." *Riley Hill General Contractor v. Tandy Corp.*, 303 Or 390, 407, 737 P2d 595 (1987). That is,

> "the tort of deceit may still be proven if the representation is made without any belief as to its truth, or with reckless disregard whether it be true or false, and in cases where representations are made by one who is conscious that he has no sufficient basis of information to justify them."

*Id.* at 406.

Although the bulk of plaintiffs' evidence, which is described above, pertains to misstatements made by Hudler,

plaintiffs also alleged that Markley, as the drafter of the Covenant Agreement, affirmatively misrepresented the amount that Bridgeport had contributed to or on behalf of Covenant in Section 2.1.2 of that agreement. That section of the Covenant Agreement states, in part:

> *"Bridgeport represents and warrants to Cruze that it has previously contributed cash to or on behalf of Covenant in the amount of $1,026,298* through and including December 31, 2007 for the purpose of the costs (e.g. engineering, architects, consultants, third party reports, and studies), to obtain the entitlements necessary and appropriate to develop the Project (the 'Entitlements' or 'Entitlement Costs') as well as pay obligations secured by the Property, which are outlined in the Keycom operating agreement a [*sic*] Regal Expenses."

(Emphasis added.) Plaintiffs presented evidence that the $1,026,298 figure was inaccurate, and that the actual contributions were significantly lower—closer to $430,000. Markley, for his part, did not dispute that there was evidence in the record that the representation was false; instead, relying on averments in his own declaration, he contended that the evidence nonetheless was "undisputed" that he was merely a scrivener who had received the number from Hudler. Specifically, in support of his motion for summary judgment, Markley offered his own declaration, in which he averred,

> "I played no part in the determination or calculation of that amount, but was *merely a passive recipient. I had no knowledge of how that figure was determined.* I was never asked to calculate, evaluate, compare or otherwise confirm the accuracy of this figure. I merely repeated the information that I was provided, *without editing it in any respect.*"

Markley also offered the declaration of Karen Harris, a former bookkeeper for Hudler and Markley's businesses, who averred that "Mr. Markley did not participate in the compiling or calculating of the expended dollar amounts."

The trial court apparently accepted Markley's and Harris's declarations as "uncontroverted evidence" that "Markley received the figure in question from others and acted as a scrivener as to that number." That involvement,

the court concluded, was insufficient to give rise to a fraud claim, and so the court granted Markley's motion for summary judgment. That ruling was erroneous, however, because the evidence was indeed controverted as to whether Markley acted as a "mere scrivener" in preparing Section 2.1.2. of the Covenant Agreement.[4]

As we explained in *Worman v. Columbia County*, 223 Or App 223, 231-32, 195 P3d 414 (2008), a party need not "specifically refute" adverse testimony in order to create a genuine issue of material fact. Rather, it was plaintiffs' burden on summary judgment to produce evidence in support of their theory of recovery—namely, that Markley made a fraudulent misrepresentation. On that point, plaintiffs presented evidence that Markley, who directly or indirectly owned or managed Bridgeport and Covenant, drafted an agreement that significantly misrepresented the amount of money that Bridgeport had previously invested in Covenant. Plaintiffs also presented evidence from Harrell, who worked for Bridgeport Construction Group, that Markley had *actual knowledge* that his partner, Hudler, was "stealing" from others. According to Harrell, in July 2008, Markley told him, "Out of all the people that [Hudler] has been stealing from I can't believe he would steal from you." Markley then reportedly said to Harrell, "I was wondering how Bridgeport was staying afloat during this last winter."

Based on that evidence—that Markley directly or indirectly owned or managed Bridgeport, Covenant, and various other entities with Hudler; that Markley had actual knowledge that Hudler was stealing from people in order to keep their joint business ventures afloat; and that Markley drafted an agreement that contained a material misrepresentation at the same time that Covenant was coming under pressure to repay its obligations—a reasonable trier of fact could find that Markley knew that his various ventures with Hudler were in dire need of cash; that he prepared the draft of the Covenant Agreement knowing that it was part of an

---

[4] Because we conclude that the misstatement in the Covenant Agreement created a genuine issue of material fact that precludes summary judgment on the fraud claim, we do not consider plaintiffs' additional contention that Markley is liable for fraud because he was present for, and did not correct, some of Hudler's other misrepresentations.

ongoing scheme to keep their businesses afloat; and that he participated in the scheme by preparing the agreement with reckless disregard of the falsity of the representation in the hopes that plaintiffs would agree to invest in Covenant.

Contrary to Markley's and the trial court's reasoning, neither the self-serving testimony of Markley, nor the declaration of his former bookkeeper, operates to defeat plaintiffs' claims as a matter of law. *See Worman,* 223 Or App at 233 n 5 ("[A] jury is always entitled to disbelieve a witness who has an interest in the outcome of the litigation. * * * If that is the case at trial, the burden should not be any higher for a plaintiff at the summary judgment stage."). Indeed, if it were otherwise—that is, if a defendant could defeat a fraud claim at the summary judgment stage simply by filing a declaration disclaiming any knowledge that the alleged misrepresentation was false—it would be virtually impossible to get such a claim to the jury based on circumstantial evidence; that is not the law. The trial court erred in granting Markley's motion for summary judgment on the fraud claim.[5]

We turn next to the trial court's grant of summary judgment on plaintiffs' second claim for relief, captioned "Joint Liability of Markley." That claim alleged that Markley acted in concert with Hudler and provided "substantial assistance" to Hudler's efforts to fraudulently induce plaintiffs' investment. The claim is premised on the principle in the *Restatement (Second) of Torts* (1979), section 876, which "reflect[s] the common law of Oregon" with respect to the circumstances in which a person who assists another in committing a tort may be liable to the third party. *Granewich v.*

---

[5] Markley also suggests that he cannot be held liable for the misstatement in Section 2.1.2 of the Covenant Agreement because he was not a party to that agreement and "did not execute or sign that agreement in any capacity." We reject that argument without extended discussion; he was a member manager of Bridgeport Group, which wholly owned Bridgeport Communities LLC, and was a manager of Bridgeport Communities LLC, the party to the Covenant Agreement; his draft of the agreement, subsequently finalized at plaintiffs' Idaho home, included essentially the same misrepresentation in Section 2.1.2. *See Osborne v. Hay,* 284 Or 133, 145-46, 585 P2d 674 (1978) ("[I]n order to hold the officer of a corporation personally liable for fraud by an agent or employee of the corporation it is necessary to show that the officer had knowledge of the fraud, either actual or imputed, or that he personally participated in the fraud. *See McFarland v. Carlsbad Sanitorium Co.,* 68 Or 530, 536-37, 137 P 209 (1914), and *Hoff v. Peninsula Drainage Dist.,* 172 Or 630, 643, 143 P2d 471 (1943).").

*Harding*, 329 Or 47, 54, 985 P2d 788 (1999). Section 876 provides:

> "For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he
>
> "(a)  does a tortious act in concert with the other or pursuant to a common design with him, or
>
> "(b)  knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or
>
> "(c)  gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person."

In *Reynolds v. Schrock*, 341 Or 338, 350, 142 P3d 1062 (2006), the Supreme Court explained:

> "[T]his court's earlier decisions hold that a person may be jointly liable with another for substantially assisting in the other's breach of a fiduciary duty owed to a third party, if the person knows that the other's conduct constitutes a breach of that fiduciary duty. *Granewich*, 329 Or at 57. Our tort case law also makes clear, however, that, if a person's conduct as an agent or on behalf of another comes within the scope of a privilege, then the person is not liable to the third party."

One such privilege is that between attorney and client; thus, "for a third party to hold a lawyer liable for substantially assisting in a client's breach of fiduciary duty, the third party must prove that the lawyer acted outside the scope of the lawyer-client relationship." *Id.* at 350-51.

The trial court, relying on *Reynolds*, ruled that plaintiffs' claims related only to Markley's

> "services as a lawyer, and there, we know from *Reynolds v. Schrock*, 'that a lawyer may not be held jointly liable with a client's breach of fiduciary duty unless the third person shows that the lawyer was acting outside the scope of the lawyer-client relationship.' No genuine issue of material fact was demonstrated to show defendant Markley was acting outside the scope of his attorney-client relationship, and

accordingly is entitled to the privilege identified in *Reynolds v. Schrock.*"

(Emphasis omitted.)

The rule in *Reynolds* does not, on this record, entitle Markley to judgment as a matter of law. *Reynolds* involved an attorney (the same Markley) who was sued based on advice he provided to Schrock concerning a settlement agreement that Schrock executed with Reynolds. Markley did not have an equity interest in the client in *Reynolds* and was not wearing two different hats—that of investor and attorney for the company—when participating in the alleged breach of duty. Here, however, there is evidence that Markley stood to benefit from the Cruzes' investment given his ownership and management involvement in the company for which he was drafting the Covenant Agreement.[6] *Reynolds* does not address the circumstance in which a lawyer is acting in two roles in a transaction—that of owner and that of lawyer—and we question whether *Reynolds* would ever extend to that situation. In no event, though, does *Reynolds* protect an attorney who commits fraud in that dual role.

As previously discussed, the trial court erred in granting the motion for summary judgment on plaintiffs' common-law fraud claim against Markley. That being the case, *Reynolds* does not provide sanctuary at the summary judgment stage for Markley's participation in what a juror could conclude was a concerted effort by Hudler and Markley to defraud plaintiffs of their investment in Covenant. *Reynolds* itself recognizes that the rule "protects lawyers only for actions of the kind that permissibly may be taken by lawyers in the course of representing their clients," and common-law fraud is not among the acts that an attorney is privileged to commit. 341 Or at 351. Thus, as was the case with plaintiffs' common-law fraud claim, the trial court erred in granting summary judgment on plaintiffs' claim that Markley is jointly liable for Hudler's misrepresentations.[7]

---

[6] Markley asserts that he "was not even a member of Bridgeport Communities, the selling company." That is true only technically, and not relevant. Markley, as an individual, was not a member of Bridgeport Communities, but he was a member manager of Bridgeport Group, LLC, which was the "100% owner of Bridgeport Communities, LLC."

[7] Markley also argues that, even if the *Reynolds* privilege does not apply, plaintiffs failed to show that he "(a) committed a tortious act in concert with Hudler,

Plaintiffs' third claim against Markley, also decided on summary judgment, was for securities law violations. ORS 59.115(1)(b) imposes liability on a seller of a security if that person

"[s]ells or successfully solicits the sale of a security in violation of ORS 59.135(1) or (3) or by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading (the buyer not knowing of the untruth or omission), and who does not sustain the burden of proof that the person did not know, and in the exercise of reasonable care could not have known, of the untruth or omission."[8]

That liability extends, under subsection (3) of the statute, beyond just the "seller":

"Every person who directly or indirectly controls a seller liable under subsection (1) of this section, every partner, *limited liability company manager, including a member who is a manager*, officer or director of such seller, every person occupying a similar status or performing similar functions, and every person who participates or materially aids in the sale is also liable jointly and severally with and

---

(b) knowingly gave substantial assistance or encouragement to Hudler's tort, or (c) [gave] substantial assistance to Hudler while also breach[ing] his own duty to [plaintiffs]." Suffice it to say that plaintiffs presented sufficient evidence of Markley's involvement with Hudler and their various joint business organizations—including fraud in drafting the Covenant Agreement—to create genuine issues of material fact on plaintiffs' joint liability claim.

[8] ORS 59.135 provides, in turn:

"It is unlawful for any person, directly or indirectly, in connection with the purchase or sale of any security or the conduct of a securities business or for any person who receives any consideration from another person primarily for advising the other person as to the value of securities or their purchase or sale, whether through the issuance of analyses or reports or otherwise:

"(1) To employ any device, scheme or artifice to defraud;

"(2) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading;

"(3) To engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person; or

"(4) To make or file, or cause to be made or filed, to or with the Director of the Department of Consumer and Business Services any statement, report or document which is known to be false in any material respect or matter."

to the same extent as the seller, unless the nonseller sustains the burden of proof that the nonseller did not know, and, in the exercise of reasonable care, could not have known, of the existence of facts on which the liability is based."

ORS 59.115(3) (emphasis added).

The trial court ruled that Markley was "entitled to summary judgment on plaintiffs' claims for securities violations for the same reasons Markley was entitled to summary judgment on the common-law fraud claims." The court continued, "I conclude as a matter of law Markley was neither a 'control person' [n]or a person who materially aided in the sale."

On appeal, plaintiffs argue that the trial court's conclusions that Markley was not a "control person" and did not materially aid in the sale were beside the point, because Markley was a *manager* of Bridgeport, the limited liability company that sold the investment in Covenant. Limited liability managers, plaintiffs point out, are separately covered by subsection (3), whether or not they also "directly or indirectly control" the seller or "materially aid in the sale." ORS 59.115(3). Markley, for his part, does not appear to dispute that he is a manager of Bridgeport—for summary judgment purposes, at least,[9] or that, as such, he presumably comes within the scope of subsection (3). Rather, Markley recasts the trial court ruling as a ruling on his *affirmative defense* under the statute—that is, that he "did not know, and, in the exercise of reasonable care, could not have known, of the existence of facts on which the liability is based." *Id.*

According to Markley, the trial court's reasoning, particularly when viewed in light of the court's ruling on the fraud claim, was premised on the fact that Markley did not know and could not have known that the representation in Section 2.1.2 of the Covenant Agreement was false. Markley

---

[9] Markley purported to resign as a manager of Bridgeport Group and Bridgeport Communities in February 2008. However, on March 31, 2008, Markley executed eight separate Nevada Security Bank loan documents as manager of Bridgeport Communities, which he described in deposition testimony as a "mistake." On October 17, 2008, Markley represented that he was a managing member of Bridgeport Group.

submits that, as a matter of law, he "could not have learned of the alleged misrepresentation under the circumstances" because, in essence, he was rushed:

"On March 16, 2008, Hudler called Markley, stating he needed a draft restatement of the Covenant Partners operating agreement. Markley prepared a draft version that he sent to Hudler via e-mail on March 18, 2008. Markley acted as a scrivener only, placing the dollar figure into the draft operating agreement. Markley could not have verified that figure between Tuesday, March 16, 2008, and Thursday, March 18, 2008, nor was Markley asked or required to do so. Hudler and Ty Cruze then modified the dollar figure further after Markley last saw it. Thereafter, Markley had no involvement in negotiations or changes to the Covenant Partners Agreement. It was not until approximately one week later that Mr. Markley first saw the executed version and learned that it had been revised.

"There was no evidence Markley knew whether the dollar amount in the Covenant Partners Operating Agreement was accurate. Markley could not independently determine the accuracy of that figure before the Operating Agreement was drafted, and later executed on March 20, 2008. Markley acted as a scrivener. Markley's disputed status as a 'manager' of Bridgeport Communities, therefore, is irrelevant. Markley did not know, and in the exercise of reasonable care could not have known of any alleged misrepresentation in Section 2.1.2. ORS 59.115(1)(b); ORS 59.137(1)-(2). Thus, the trial court correctly granted Markley summary judgment on [plaintiffs'] securities claim."

Once again, we disagree with Markley's premise that the evidence in the record is susceptible only to the inference that he was a scrivener to the Covenant Agreement. Markley was a manager of Bridgeport, and, under the totality of the circumstances, a juror could infer that, at the very least, he turned a blind eye to Hudler's dealings and misrepresentations. Moreover, Bridgeport was the sole owner of Covenant; a trier of fact could certainly find that Markley, a manager of Bridgeport, "in the exercise of reasonable care" could have known of the contributions made by Bridgeport to Covenant, a company wholly owned by Bridgeport, and could have therefore determined that the representation in Section 2.1.2 was false.

In short, there are genuine issues of material fact as to whether Markley was a manager of a seller, Bridgeport, and whether Markley is liable for securities law violations. The trial court erred in concluding otherwise.[10]

Consequently, the trial court also erred with respect to plaintiffs' claim based on financial elder abuse, ORS 124.110. The trial court reasoned, "Since defendant Markley is entitled to summary judgment on the common-law fraud claim, securities claim, and joint liability claim, he is also entitled to summary judgment on the elder law claim." Presumably, the court determined that there were no genuine issues of fact as to whether Markley acted wrongfully. *See* ORS 124.110(1)(a) (authorizing action for financial abuse where "a person wrongfully takes or appropriates money or property of a vulnerable person, without regard to whether the person taking or appropriating the money or property has a fiduciary relationship with the vulnerable person"). For the reasons previously discussed, however, the record is susceptible to competing inferences with regard to whether Markley made a fraudulent misrepresentation to plaintiffs; we therefore reverse the trial court's grant of summary judgment on the elder abuse claim. *See Church v. Woods*, 190 Or App 112, 118, 77 P3d 1150 (2003) (conduct is "wrongful" under ORS 124.110 if it is carried out by improper means, including deceit and misrepresentation).

## II. MOTIONS TO AMEND

Plaintiffs next contend that the trial court erred in refusing to allow them to amend their complaint to add claims against Hudler and Markley under the Oregon Racketeer Influenced and Corrupt Organizations Act (ORICO), ORS 166.715 to 166.735. Plaintiffs twice attempted to amend

---

[10] In a cross-assignment of error, Markley contends that membership interests in Covenant were not securities within the meaning of ORS chapter 59, and plaintiffs' claims for securities law violations therefore fail as a matter of law. The trial court did not expressly address that issue with respect to Markley's motion for summary judgment, but in denying Hudler's motion ruled that plaintiffs' investment "qualifies as an 'investment contract' as defined by the Oregon Supreme Court" in *Pratt v. Kross*, 276 Or 483, 555 P2d 765 (1976). At the very least, there are genuine issues of material fact as to whether Bridgeport sold a "security" to plaintiffs in connection with the Covenant Agreement; we therefore reject Markley's cross-assignment of error without further discussion.

their complaint to add ORICO claims, and the trial court denied both motions on the ground that the proposed ORICO claims would "fail as a matter of law." Specifically, the trial court reasoned that (1) plaintiffs' ORICO claims were based on conduct that would constitute securities fraud, and (2) the legislature did not intend for a civil ORICO claim to be brought based on securities fraud until after the defendants were *convicted* of that racketeering activity in a criminal case.

On appeal, plaintiffs argue that their proposed ORICO claims alleged three incidents of *a forgery-related offense*, albeit in the context of securities transactions, and that the ORICO statutes do not require a predicate conviction for civil claims based on that particular racketeering activity. *See* ORS 166.725(7)(a)(B) (aggrieved person may bring a civil ORICO claim for damages "[i]f the violation is based on racketeering activity as defined in" ORS 166.715(6)(P) (referring to forgery and related offenses)). Defendants Hudler and Markley, meanwhile, argue that plaintiffs' construction of ORS 166.725 is implausible because it would create a statutory loophole that would allow plaintiffs to cleverly plead their way around the requirement of a predicate conviction for securities fraud simply by styling the racketeering activity as the "forgery" of securities documents, thereby frustrating obvious legislative intent.

" 'Although we generally review a court's denial of a motion to amend only for abuse of discretion, when the denial results from a substantive legal conclusion, we review the correctness of that conclusion' for errors of law." *Cowan v. Nordyke*, 232 Or App 384, 386, 222 P3d 1093 (2009), *rev den*, 348 Or 114 (2010) (quoting *Wallace v. Hinkle Northwest, Inc.*, 79 Or App 177, 179, 717 P2d 1280 (1986)). In this case, the trial court's rulings on plaintiffs' motions to amend were predicated on its interpretation of ORS 166.725, an issue of law.

Plaintiffs' proposed ORICO claims against Hudler and Markley alleged a violation of ORS 166.720(3), which makes it "unlawful for any person employed by, or associated with, any enterprise to conduct or participate, directly or indirectly, in such enterprise through a pattern of racketeering activity or the collection of an unlawful debt." A "pattern

of racketeering activity" is defined as "engaging in at least two incidents of racketeering activity" that share intents, results, accomplices, victims, methods of commission, or are otherwise interrelated by distinguishing characteristics. ORS 166.715(4). "Racketeering activity," in turn, includes "conduct that constitutes a crime" as enumerated in a long list of statutes, ORS 166.715(6)(a)(A)-(CCC).

Before 1995, a civil claim for racketeering could be brought based on a pattern of any of the racketeering activities enumerated in ORS 166.715(6). However, that year the legislature amended ORS 166.725 to forestall certain civil racketeering claims until criminal proceedings have had an opportunity to run their course. As amended, ORS 166.725(7)(a) provides:

> "Any person who is injured by reason of any violation of the provisions of ORS 166.720 (1) to (4) shall have a cause of action for three-fold the actual damages sustained and, when appropriate, punitive damages:

> "(A)    If a criminal conviction for the racketeering activity that is the basis of the violation has been obtained, any rights of appeal have expired and the action is against the individual convicted of the racketeering activity; or

> "(B)    If the violation is based on racketeering activity as defined in ORS 166.715(6)(a)(B) to (J), (K) as it relates to burglary and criminal trespass, (L) to (P), (S), (T) , (U), (V), (X) to (Z), (AA) to (DD), (KK), (LL) or (OO) to (VV)."

The effect of the 1995 amendments is that, unless the violation is based on racketeering activity specifically listed in subparagraph (B), a plaintiff now cannot bring an ORICO claim until a criminal conviction for the underlying racketeering activity has been obtained and any rights of appeal have expired.

The issue in this case stems from what is and is not listed in subparagraph (B). Securities fraud, a racketeering activity under ORS 166.715(6)(a)(A), is not listed, nor are many other business-related crimes, e.g., ORS 166.715(6)(a)(Q) (racketeering relating to business and commercial offenses), ORS 166.715(6)(a)(GG) - (HH)

(banking and credit unions), ORS 166.715(6)(a)(NN) (mortgage bankers and mortgage brokers). Forgery-related offenses, which are racketeering activity under ORS 166.715(6)(P), *are* listed in subparagraph (B) and do not require a predicate conviction in order to serve as the basis for a civil ORICO claim. *See* ORS 166.715(6)(P) (racketeering activity includes conduct constituting a crime under "ORS 165.007 to 165.022, 165.032 to *165.042* and 165.005 to 165.070, relating to forgery and related offenses" (emphasis added)).

There is no dispute that plaintiffs, in their proposed ORICO claims, allege that Hudler and Markley engaged in a pattern of racketeering activity that included multiple "incidents" involving violations of ORS 165.042, which is among the racketeering activity listed in subparagraph (B). ORS 165.042 makes it a crime to "fraudulently obtain[ ] a signature if, with intent to defraud or injure another, the person obtains the signature of a person to a written instrument by knowingly misrepresenting any fact." Plaintiffs' proposed ORICO claims allege that Hudler fraudulently obtained a signature on a deed by making misrepresentations, and that both defendants fraudulently obtained the signatures of Tyrone and Jaqueline Cruze on various LLC operating agreements and closing documents by way of misrepresentation.

Plaintiffs submit that, under the plain language of ORS 166.725(7)(a)(B), they therefore have a cause of action "based on racketeering activity as defined in ORS 166.715(6)(a)(P)"—*i.e.*, fraudulently obtaining a signature. In their view, the fact that the alleged violations might also be racketeering under other provisions that are not listed in subparagraph (B) is immaterial; the legislature *expressly* carved out an exception for civil claims based on a pattern of forgery-related offenses, and that is what they pleaded.

Defendants, meanwhile, maintain that cannot be the case because the 1995 amendments reflect "clear legislative intent to bar acts related to securities law violations from being civil ORICO predicate acts." Defendants rely

extensively on the legislative history of those amendments, which indicates that one of the motivating forces behind the statutory changes was concern about the prevalence of civil ORICO claims in the business context, particularly with regard to alleged securities law violations. In light of that "clear legislative intent," defendants contend that "[w]hen the same facts allegedly support both a securities violation and a civil ORICO violation, those facts cannot form the basis of a civil ORICO claim in the absence of a criminal conviction." Otherwise, they argue, the statute would include an "immense gap" that "would allow plaintiffs to creatively recast any securities-related claim as simply a tort involving its constituent elements."

Defendants' view of ORS 166.725 is long on generalized intent but short on textual or contextual support. Defendants do not offer any plausible construction of the text of ORS 166.725(7)(a)(B) that would suggest that conduct that falls within its enumerated list nevertheless is disqualified from subparagraph (B) if it could also be categorized as another nonenumerated racketeering activity. Nor do defendants muster any persuasive contextual support for their construction; indeed, the textual clues point in the other direction.

As part of the same 1995 amendments, the legislature enacted ORS 166.725(13). Or Laws 1995, ch 619, § 13. That subsection of the statute provides,

> "Notwithstanding subsection (6) or (7) of this section, a person may not institute a proceeding under subsection (6) of this section and does not have a cause of action under subsection (7) of this section if the conduct that is the basis of the proceeding or action *could also be the basis of a claim of discrimination because of sex that constitutes sexual harassment.*"

(Emphasis added.) Thus, the legislature plainly understood that the same conduct might violate more than one statutory provision and dealt with that possibility expressly as part of the same amendment. If the legislature had intended the same type of limitation in subsection (7) of the 1995 amendments, it easily could have said so.

Defendants also draw on the "federal rule embodied in 18 USC § 1964(c), completely barring a securities-related predicate act from being a RICO predicate act," and suggest that ORICO embodies a similar rule. *See, e.g., Howard v. America Online, Inc.*, 208 F3d 741, 749 (9th Cir 2000), *cert den*, 531 US 828 (2002) (holding that securities fraud cannot be used to establish a racketeering violation under federal law). ORICO, although modeled on the federal racketeering law, 18 USC §§ 1961 - 1968, contains materially different language from federal law on that point. In fact, federal law contains language similar to that in ORS 166.725(13), referring broadly to whether the underlying conduct "would have been actionable as fraud": "[N]o person may rely upon *any conduct that would have been actionable as fraud in the purchase or sale of securities* to establish a violation of section 1962." 18 USC § 1964(c) (emphasis added).

In contrast to the federal racketeering statutes, nothing in the text or context of ORICO suggests that ORS 166.725(7)(a)(B) means anything other than what it says: A plaintiff has a cause of action if the "violation is based on racketeering activity as defined in * * * ORS [166.715(6)(a)](P)." Nor does the legislative history of the 1995 amendments alert us to any latent ambiguity in the statute. *State v. Gaines*, 346 Or 160, 172-73, 206 P3d 1042 (2009) (Although a party "may use legislative history to attempt to convince a court that superficially clear language actually is not so plain at all—that is, that there is a kind of latent ambiguity in the statute[,]" if the "text of a statute is truly capable of having only one meaning, no weight can be given to legislative history that suggests—or even confirms—that legislators intended something different.").

We thus apply the statute as it is written. Plaintiffs have alleged a violation of ORICO based on a pattern of falsely obtaining signatures, racketeering activity as defined in ORS 166.715(6)(a)(P). The trial court therefore erred in denying plaintiffs' motions to amend based on an overly narrow construction of ORICO; on remand, the court should reconsider whether to allow plaintiff to proceed on an

amended complaint that includes ORICO claims based on racketeering activity of fraudulently obtaining signatures.[11]

Reversed and remanded.

---

[11] Hudler alternatively argues that plaintiffs' allegations are insufficient to allege a violation of ORS 165.042, fraudulently obtaining a signature, because the documents that defendants allegedly signed were not "written instruments." The definition of "written instrument" is far broader than Hudler allows, and we reject his alternative argument without discussion. *See* ORS 165.002(1) (defining "written instrument" to include "any paper, document, instrument, article or electronic record containing written or printed matter or the equivalent thereof, whether complete or incomplete, used for the purpose of reciting, embodying, conveying or recording information or constituting a symbol or evidence of value, right, privilege or identification, which is capable of being used to the advantage or disadvantage of some person").